Donald COLE, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 425, 2004.

Supreme Court of Delaware.

Submitted: Sept. 14, 2005.
Decided: Oct. 19, 2005.
Revised: Oct. 20, 2005.

Michael C. Heyden and Jan A.T. van Amerongen, Jr. (argued), Wilmington, DE, for appellant.

John R. Williams, Department of Justice, Dover, DE, for appellee.

Before STEELE, Chief Justice, BERGER, and RIDGELY, Justices.

STEELE, Chief Justice:

Pursuant to an agreement he thought he had with the State, the defendant-appellant, Donald Cole, made a statement to the police and prosecutor implicating one of his accomplices to a crime. The police confronted the accomplice with Cole's statement. Cole believed that the agreement he had reached before making his statement prohibited the State from using the statement for any purpose other than determining whether the State would seek the death penalty. On the basis of the alleged agreement, as he claims to have understood it, Cole moved to suppress all evidence obtained from the State's use of his statement, including his accomplice's testimony. A Superior Court judge denied the motion. Cole appeals. Because we are unclear about whether an agreement existed, and if it did, what its terms were, we remand to the Superior Court for further findings.

## I.

On December 3, 2001, Donald Cole and Elwood Hunter were charged with attempted murder, robbery and related charges stemming from an incident that occurred on August 22, 2001 at 1348 Lancaster Avenue in Wilmington. Cole and Hunter allegedly entered the Lancaster Avenue residence armed with handguns intending to steal money and drugs. The residents of the house discovered the intruders and an altercation ensued. During the confrontation, Cole and Hunter allegedly shot two of the residents.

Before the trial, Daniel Miller, the Deputy Attorney General prosecuting Cole and Hunter, filed a motion *in limine* seeking to admit evidence concerning a double homicide that occurred on August 31, 2001 at 105 E. 23rd Street in Wilmington. Neither Cole nor Hunter had been charged with the 23rd Street murders, but the motion advised that the State would produce ballistics evidence to show that the same firearms had been used at the 1348 Lancaster Avenue attempted murder and then nine days later at the 23rd Street murders. The motion *in limine* also proffered that the State would produce a witness who would testify to seeing both Cole and Hunter near the alley behind 23rd Street armed with handguns. The trial judge denied the motion.

During the course of the trial of the 1348 Lancaster Avenue attempted murder, the State produced an eye-witness who identified Hunter as one of the assailants. The witness was so sure of her identification, that she considered it to be an eleven on a scale of one to ten. The State produced no witnesses that identified Cole.

Cole knew that the witness was mistaken in her identification of Hunter. He decided to plead guilty to the charges in the 1348 Lancaster Avenue case and to provide a statement regarding the incident if the State would drop the prosecution of Hunter, a man Cole knew to be innocent. Cole told his trial attorney, Brian Bartley, of his decision. Bartley advised Cole not to plead guilty in the 1348 Lancaster Avenue case. Because of the State's *in limine* motion, Bartley was aware that the State had ballistic evidence tying the 1348 Lancaster Avenue case and the 23rd Street murders together. Accordingly, Bartley advised Cole that if he pleaded guilty to the 1348 Lancaster Avenue charges, there was a real probability that the State would charge him with the 23rd Street murders and possibly seek the death penalty.

Despite his attorney's advice, Cole was still determined to exonerate Hunter. During a break in the trial on January 13, 2003, Bartley approached Miller and informed him that Cole wished to plead guilty to the 1348 Lancaster Avenue

charges and to make a statement exonerating Hunter. Bartley tried to strike a deal whereby Cole would be spared the death penalty should he be charged with the 23rd Street murders. He told Miller that in exchange for a waiver of the death penalty in connection with the 23rd Street murders that Cole would make a statement about both the 1348 Lancaster Avenue and the 23rd Street incidents. Miller responded that he did not have the authority to make this deal because he had to present Cole's offer to the Senior Staff in the Office of the Attorney General who would have the final say.

Miller presented Cole's *initial* offer to the Senior Staff on the morning of January 14, 2003. By the middle of the afternoon, the defense rested its case. After a lunch recess, Miller and Bartley resumed their negotiations. They decided that Cole would confess to the attempted murder at 1348 Lancaster Avenue and make a statement concerning the 23rd Street double homicides. Miller informed Bartley that the Senior Staff would not consider extending a non-capital offer on the 23rd Street homicides to Cole until they knew the content and substance of Cole's proffered statement. The agreement was not set forth in writing and Miller and Bartley have since consistently disagreed about its terms.

Cole knew that Miller could not make an "up front deal" to avoid the death penalty in exchange for his statement. Cole thought, however, that the State would agree not to seek the death penalty against him if the information he provided turned out to be true. He believed that Miller would take the statement back to

the Senior Staff and, in turn, the Senior Staff would review Cole's cooperative statement and give *bona fide* consideration to abstaining from requesting the death penalty. Moreover, Cole realized that the State would attempt to corroborate the statement. Finally, Bartley thought that the State's use of Cole's statement would be strictly limited to the State's determination of the death penalty question. In other words, Bartley interpreted the agreement to prohibit the State from using the statement for investigative purposes or to in any way advance the potential prosecution of Cole for the 23rd Street homicides.

With what he thought to be an agreement in place, on January 14, 2003, Cole made a detailed statement concerning both the 1348 Lancaster Avenue incident and the 23rd Street homicides. At the beginning of the statement, which Detective Scott Chaffin of the Wilmington Police Department recorded, Miller described the deal to Cole:

> ...the deal *right now* is that we are going to take uh a [proffer] statement of what you have to say about anything we ask you about and I'm going to take that statement back to my superiors and discuss with them whether to make you an offer where you would be spared capital punishment. Do you understand that? [1]

Cole responded that he did understand. Miller and Chaffin then proceeded to question Cole about the two incidents. Cole admitted his involvement in the 1348 Lancaster Avenue attempted murder and provided a statement concerning the incident. Cole also provided a detailed statement regarding his involvement in the 23rd

---

1. Police Transcript of Cole's Statement pg 1 (emphasis added). As we understand the record, Miller's described "deal" terms did not include publishing the statement to Cole's accomplices in the 23rd Street homicides or anyone else beyond Miller's "superiors." That is what he says he wanted Cole to understand before Cole made his statement and that is what Cole now claims to be his understanding.

Street murders. In connection with the 23rd Street murders, Cole implicated two of his accomplices, Larry Johnson and Travanian Norton. After about an hour of questioning, the parties finished the interrogation for the day. The following interchange then occurred:

Miller: We'll we'll [sic] terminate this and uh I'm gonna [sic] go ·back to my office and do what I told you I was gonna do [at] the beginning of this interview. Okay and uh obviously this conversation is not over we'll pick it up. Plus you don't want us to discuss the substance of this outside this room. *Yeah we're not gonna talk about this with Sticky or Larry Johnson or anybody else.* I I[sic] understand what you're saying, but listen [while] this is still ongoing there's a reason why we want that. We know what you're saying to us and we [sic] we're gonna hold up our end. But listen we can't have anybody [know] it the less people know the less it's gonna leak out there.

Cole: I think Sticky already knows.

M: Why do you know that?

C: Cause we talked.

M: Alright well let's not from now on [sic] don't talk about it.[2]

Later in the same afternoon, after making the statement, Cole pleaded guilty to the 1348 Lancaster Avenue attempted murder. Cole's statement ultimately exonerated Hunter with respect to the Lancaster Avenue incident and the State never charged Hunter with the 23rd Street murders.

The police later took Travanian Norton into custody for other reasons. While Norton was in custody, Chaffin questioned him about the 23rd Street murders. In doing so, he did exactly what Miller told Cole that the State would NOT do. Chaffin "talked about the statement with someone else." Moreover, Chaffin played a portion of Cole's statement to him.[3] It appears that in the portion of the tape played, Cole implicated Norton by using Norton's nickname. After being advised that Cole had implicated him in the 23rd Street murders, Norton gave a full statement implicating Cole and Johnson. Norton was the only eye-witness who unequivocally identified Cole.

After corroborating a portion of Cole's statement, the prosecution ultimately decided to indict Cole and seek the death penalty. Cole filed a motion to preclude the State from seeking the death penalty. The Superior Court judge held a hearing to examine the particulars of the alleged agreement into which Bartley, Cole and the State entered. The trial judge concluded "the transcript contains no promises about benefit to Cole as a result of the proffer, other than [the State's] willingness to consider the information and review his request again with the senior staff. Notwithstanding Cole's assertions otherwise [that if the prosecution found his statement to be true that he would be spared the death penalty], it appears that it was not until after the proffer that a misunderstanding developed."[4] The judge also noted:

The State acknowledges that the proffer is subject to the protection of D.R.E. 410. The State will not be permitted to use the proffer at trial unless the excep-

---

2. *Id.* at pg 44 (emphasis added). We read this exchange to be entirely consistent with what Miller wanted Cole to understand to be the scope of Miller's use of the statement before Cole gave it.

3. Appellant's App. A–144. The state also played a portion of Cole's statement to Larry Johnson. *Id.* at A–94.

4. Memorandum Opinion, Cr. I.D. No. 0309013358, April 21, 2004 at 11.

tion set forth in the rule pertains. Defendant argues that the State improperly used Cole's statement in investigating the 23rd Street crimes. Specifically, Cole charges that the State used the statement to persuade Norton to give a statement. Cole offers no authority for [his] assertion and I decline to speculate about the legal basis for this position as, has previously been stated, there was no agreement between Cole and the State when the proffer was given. . . .

I find no merit in the argument that the State must be held to an alleged agreement because the defendant acted to his detriment in reliance on it. There was no agreement before the proffer. There was no consideration for an agreement afterward. The State's willingness to consider the death penalty eligibility of the defendant presumably is available to any defendant, depending on the circumstances of the crime.[5]

The judge, accordingly, denied Cole's motion to preclude the State from seeking the death penalty.

Cole's trial continued with Cole risking the death penalty if convicted. During the trial, the defense filed a motion to exclude the evidence gained as a result of Cole's statement, including Norton's potential testimony. The trial judge denied the motion to suppress in an oral ruling in chambers. She stated,

I reviewed the statement that was taken by the State. The statement was taken with counsel present, it was taken against the advice of counsel, and it was taken voluntarily because Mr. Cole wanted to give it.

And the motion to suppress. The state restricted itself to the sole purpose of deciding whether to proceed non-capitol [sic]. In fact, as I review this, the only thing that the state committed itself to—it did not say what it would do, it said it wouldn't use the statement at trial. In other words it would comply with the requirements of 404.

The only restriction the State imposed on itself was the restriction the Rules of Evidence imposed on the State and that is . . . not to use the defendant's statement unless the defendant testified inconsistent [sic] at trial, which is what 410 says.

So at this point, there being no further record presented to me, and the defendants having ample opportunity to explore this[,] I'm going to deny the motion to suppress.[6]

Cole was ultimately convicted, but not sentenced to death. Therefore, this appeal concerns only the admissibility of the evidence derived from the State's use of Cole's statement. In short the question presented on appeal is whether the trial judge erred when she denied Cole's motion to suppress.[7]

## II.

■■■ We review a trial judge's refusal to grant a motion to suppress evidence under an abuse of discretion standard.[8] In

---

5. *Id.* at 12–13.

6. Appellant's App. A–149. Here, the trial judge's ruling narrowly addresses what she was asked to address and nothing more— whether Norton's testimony, induced by Cole's statement, should be barred—based upon the State's improper use of Cole's statement.

7. While the parties briefed two additional issues, they stipulated at oral arguments that this court's intervening ruling in *Johnson v. State*, 878 A.2d 422 (Del.2005) decided these issues. The appellant's opening brief was filed on June 17, 2005. *Johnson* was decided on July 1, 2005.

8. *Gregory v. State*, 616 A.2d 1198, 1200 (Del. 1992).

this case, however, the trial judge based her denial of the defendant's motion to suppress on the finding that there was no agreement between the defendant and the state. "[P]lea agreements are undertaken for mutual advantage and governed by contract principles."[9] Therefore, we look to contract law for the applicable standard of review. A trial judge's interpretation of contract language involves questions of law that this Court reviews *de novo* for legal error.[10] Conversely, a trial judge's ruling concerning the existence or nonexistence of an oral contract is a question of fact that we review for an abuse of discretion.[11]

### III.A

■ As noted in the previous section, plea agreements, and any other agreements into which the State and a defendant may enter, are governed by contract principles. One of these contract principles is the implied covenant of good faith and fair dealing. While we have never before expressly considered this covenant in the context of a plea agreement or agreement between a criminal defendant and the state in any context, it is well-supported by the common law in other jurisdictions.[12] Accordingly we make explicit what was always implicit: in Delaware, a covenant of good faith and fair dealing applies to plea bargains as well as to any agreement between a criminal defendant and the State. "Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms."[13] This concern is particularly relevant in the context of agreements between the State and a criminal defendant, as the State will almost always be in a position to take advantage of its superior ability to control implementation of the

9. *Washington v. State*, 844 A.2d 293, 296 (Del. 2004).

10. *Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 950 (Del.2005).

11. *See e.g., Wheeler v. Clerkin*, 2005 Del. LEXIS 149 (Del.2005); *See also Philips Bros. Elec. Contrs., Inc. v. Great Am. Ins. Co.*, 133 Fed. Appx. 815, 816 (3d Cir.2005) ("In the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact.")

12. *See State v. Johnson*, 1981 Ohio App. LEXIS 10183, *5 (Ohio Ct.App.1981) ("[T]here is a duty upon the prosecution to negotiate in good faith in plea bargains."); *Commonwealth v. Newmiller*, 487 Pa. 410, 426, 409 A.2d 834 (1979) ("The prosecution must bargain in good faith, strictly and faithfully uphold its end of a plea bargain agreement, and treat the accused with fairness throughout the plea bargaining process."); *State v. Williams*, 103 Wash.App. 231, 235, 11 P.3d 878 (Wash. Ct.App.2000) ("Plea agreements are contracts, and the law imposes upon the State an implied promise to act in good faith"); *United States v. Erdil*, 351 F.Supp.2d 58, 62–63 (D.N.Y.2005) ("Cooperation agreements, like plea bargains, are interpreted according to the principles of contract law[;]... there is an implied obligation of good faith and fair dealing in every contract"); *State v. Scott*, 230 Wis.2d 643, 602 N.W.2d 296 (Wis.Ct.App. 1999) ("An analysis of a plea agreement under standard contract law leads to the same result as does an analysis under the due process clause. Every contract entails an implied obligation of good faith and fair dealing."); *Sides v. State*, 575 So.2d 1232, 1236 (Ala.Crim.App.1991).

13. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (internal quotations and citations omitted).

agreement's terms. In light of this concern, we emphasize the special role of the prosecutor in a criminal case:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape [n]or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[14]

And, unlike police officers, prosecutors have special responsibilities as lawyers.[15]

■ From our reading of the record, we have three concerns about the State's conduct in this case:

a. The prosecutor, as agent for the State, may have breached the express terms of an agreement with Cole; or

b. The prosecutor may have authorized a breach of the covenant of good faith and fair dealing implied in an agreement with Cole; or

c. The prosecutor may have made a false representation to Cole about the limited use the prosecution intended to make of Cole's statement.[16]

As noted above, at the beginning of Cole's statement, Miller advised Cole of the deal in place by saying that the *quid pro quo* for getting the truth from Cole about who participated in both incidents would be his taking the statement back to the Senior Staff and discussing with them whether to seek the death penalty in the 23rd Street murders. Miller did not say that "the deal right now" contemplated *any* other use of the statement including using Cole's statements to confront other suspects. The issues thus become: (1) having promised to take the statement to his "superiors" for review in exchange for the identity of the perpetrators of attempted and consummated homicides, did the prosecutor create a reasonable expectation in Cole's mind that the statement would indeed be used solely for that purpose?; and (2) is Cole's reasonable expectation and interpretation of Miller's language enough to require that we import the limitation on the use of Cole's statement into the agreement under the implied covenant of good faith and fair dealing?

At the end of Cole's statement, Miller seems to reinforce Cole's expectation that the statement would be not be shown to anyone other than Senior Staff in the Attorney General's Office by saying:

> *Yeah we're not gonna talk about this with Sticky or Larry Johnson or anybody else.* I I [sic] understand what you're saying, but listen [while] this is still ongoing there's a reason why we want that. We know what you're saying to us and we [sic] we're gonna hold up our end.

Shortly after Miller made this statement, he directly authorized Chaffin to act con-

---

14. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

15. *See e.g.,* DELAWARE LAWYERS' RULES OF PROF'L CONDUCT, Rule 3.8.

16. *See e.g.,* DELAWARE LAWYERS' RULES OF PROF'L CONDUCT, Rule 4.1 and cmt.

trary to his representation to Cole. The hearings before the trial judge largely focused on whether Cole could reasonably expect a *bona fide* review by Senior Staff which might result in their decision not to seek the death penalty should he be indicted for the 23rd Street homicides and whether the State had promised to comply with D.R.E. 410. Neither the parties nor the trial judge gave any attention to the following exchange:

MR. GEORGE (State's appellate attorney): Based on the conversations that you overheard with Mr. Miller and Mr. Bartley, either the day of the trial when this first came up or the next day when you *took the statement, did you understand there to be any limitations on what you could do with a statement if it were given, meaning any limitation on your ability to further investigate this?*

A (Chaffin): That was my issue very quickly, and that's what I brought up to Mr. Miller. I asked him that directly as to, are we locked in with Mr. Cole. Can I still role with the investigation. He said, no, I'm not limited in what I can do. So I went on with my investigation.

MR. GEORGE: Okay. Thank you very much.

17. A-96 Appellant's App. (emphasis added).

18. Appellant's App. A-85. Another relevant section of Miller's testimony follows:

Question (Cole's appellate attorney): Well, I'll ask you the questions... You told Mr. Cole and Mr. Bartley that you weren't going to take the statement outside and discuss it with anybody?

Answer (Miller): Incorrect. The express purpose of the statement was, it was known to Mr. Cole before we took the statement that I *was going to take it to other people,* including for example, the senior staff.

The Court: I think if you read the balance of the page, it sheds a little light on it.

On redirect, Cole's appellate attorney, Mr. Van Amergongen, followed up:

Q: You asked him if you're locked in despite having heard the conversations between Mr. Miller and Mr. Bartley; correct?

A (Chaffin): Yes.[17]

This exchange suggests to us that even Chaffin believed the prosecutor promised Cole that Cole's statement would not be used beyond a Senior Staff review or at least would not be shown to any identified co-perpetrators of the 23rd Street homicides. Miller told Chaffin that he was "not limited in what I [Chaffin] could do." After Miller authorized him to go forward, Chaffin did confront Norton and Johnson with Cole's statement; he even played portions of it to them. In short, the State did the exact opposite of what the prosecutor said it would do.

During the hearing on Cole's motion to preclude the death penalty, Miller testified to explain exactly what he meant by his statement at the end of Cole's interrogation. According to Miller this statement did not "relate to investigative purposes." It related to Cole's "natural concern as someone who has just dimed out a couple other people in a murder that they might find out about it and then come after him, or do something else."[18]

Answer (Miller): Thank you, Your Honor. That's a good point. The—Mr. Cole is picking up on the context of it too and says, "I think Sticky already knows," which establishes that the context was who in the prison might find out about this.

The Court: That comment, "I think Sticky already knows" how do I know who's saying that?

Answer (Miller): Because I'm talking... I can tell you, Your Honor, that this conversation is between myself and Mr. Cole. And he expresses—he picked up, he knows the context, because he acknowledges that Sticky already knows.

Miller thus explains his interchange with Cole at the end of the transcript of Cole's statement in terms of protecting Cole from retribution from other criminals he may have implicated.[19] Even if this is a plausible reading, it establishes a promise, leaving in issue the nature and scope of the promise to Cole. Under *its interpretation* of the "agreement" the State essentially said "We won't tell anyone about this, Mr. Cole, so your accomplices don't come after you." It then proceeded to tell those very accomplices Miller claims to shield from Cole, Norton and Johnson, who would have very strong retributive motives as a result of Cole "diming them out."

### III.B

From the record, we are unable to reach a conclusion at this time other than to remand this matter to the trial judge for further consideration. Miller's statements at the beginning and the end of Cole's interrogation suggest that some sort of "deal" based on a promise by the State may have been in place. Before taking Cole's proffer, Miller set forth "the deal right now." At the end of the proffer, Miller told Cole that the State would "hold up its end" by taking Cole's statement back to the Attorney General's office and *do what he said he would do at the beginning of the interview* (whatever that might have been is not sufficiently explained in the record). Miller further told Cole "we're not going to talk about this with . . . anybody else." He then authorized a skeptical Chaffin to do that very thing.

We recognize that in her Memorandum Opinion denying Cole's motion to preclude the death penalty the trial judge noted that "there was no agreement" between

Cole and the State when the proffer was given. But we interpret that reference to be limited to a promise not to ask for the death penalty—the subject of Cole's motion at the time—and nothing more. Cole's counsel argued no legal theory to support any other basis for breach of implied terms of an agreement. Therefore, the trial judge wisely did not speculate about any alternative legal bases for Cole's argument.

When reaching the conclusion that the state did not agree to take the death penalty "off the table", the trial judge noted "[t]he State's willingness to consider the death penalty eligibility of the defendant *presumably* is available to any defendant, depending on the circumstances of the crime." Earlier in the opinion, she stated "the transcript contains no promises about benefit to Cole as a result of the proffer, *other than* [the State's] willingness to consider the information and review his request again with the senior staff." If the State's willingness to consider the death penalty eligibility of a defendant is presumably available to any defendant, the state would not have needed to promise to consider the information in Cole's case. Nonetheless, the transcript suggests that the prosecutor made two representations: a promise to have a *bona fide* Senior Staff review of death penalty eligibility; and, a promise not to compromise Cole with other suspects. We are uncertain about how the State could promise not to "talk about this with . . . anybody else" and yet there could still be no agreement about the conditions of the proffer; particularly when Cole clearly gave some benefit to the State by making his statement clearing an innocent person wrongly accused and implicat-

---

**19.** This explanation may strike some as odd. The State, Miller would have us believe, would assure Cole that they would not show his statement to someone who might "come after him," but the State would feel free to show it to that same person in order to facilitate convicting Cole of intentional murder and ultimately to seek his execution.

ing Norton, one of the actual perpetrators (presumably matters of equal concern to a conscientious prosecutor). We are also confused about the trial judge's statement that "there was no consideration for an agreement after [Cole's proffer]." Specifically, does this refer to Miller's statement at the end of Cole's testimony? Perhaps, then, the State promised to do something after the proffer, but received no consideration in return? Does this ignore the reference to the limited use of the statement even before it was given?

In her oral decision denying Cole's motion to suppress evidence derived from his statement, the trial judge found that the only thing the state committed itself to do was to not use Cole's statement at trial. The Delaware Rules of Evidence, however, already impose this restriction on the state.[20] In this case, if the State promised only to "consider" Cole's proffer with respect to "death penalty eligibility", something it would *presumably* do in any case, and to follow the Rules of Evidence already in place, it would appear that Cole received no benefit from making his statement. In light of the references to a "deal" and "holding up our end" of the deal in Miller's statements at the beginning and, more importantly, the end of Cole's interrogation, and our concern over the State's action in apparently saying one thing and doing the exact opposite, we remand this case to the trial judge for further factual findings.

We recognize that we review a trial judge's decision on a motion to suppress for abuse of discretion. When the decision on a motion to suppress turns on the trial judge's conclusion about the existence or non-existence of an oral contract, we similarly review for an abuse of discretion. At this point, we are NOT saying the trial judge abused her discretion. We simply remand so that the trial judge can make her factual findings with respect to the motion to suppress more explicit than she did in her oral ruling with the benefit of the arguments we considered on appeal. In doing so we ask the trial judge to consider:

1. Did Cole and Miller enter impliedly or explicitly into any agreement before the proffer limiting the State's use of Cole's statement to consideration of death penalty eligibility?

2. What does Miller's statement at the end of Cole's interrogation signify?

   a. Does it further clarify the deal, if any, between the parties that existed before the proffer? Or does it relate only to Cole's concern that other people involved in a homicide might find out about it and then come after him, or "do something else?"

   b. In either case, what is the significance of the prosecutor saying one thing ("we won't talk about this with anyone else") and authorizing the police to do the opposite (confronting Norton and Johnson with Cole's statement)? More specifically, did the parties have any reason to believe that the bargain into which they entered before Cole made his statement included a limitation on its use and did the State violate the implied covenant of good faith and fair dealing by acting contrary to Cole's reasonable expectation of the "deal?"

   c. Did the prosecutor misrepresent how the State would use Cole's statement?

20. D.R.E. 410.

3. Did Cole detrimentally rely on the State's promise to use his statement for a limited purpose, if it did so promise before the proffer, before making his statement?

4. If an agreement existed and Cole relied on it to his detriment, and the State breached the agreement, what remedy applies? Would specific enforcement of the agreement require a new trial or, given the weight of the evidence, would Cole have been convicted without Norton's testimony?

### III.C.

■ We note that the parties could have easily avoided this confusion by putting their agreement in writing or on the record BEFORE the proffer. Under Superior Court Civil Rule 90(c), the Superior Court will not consider agreements between attorneys unless they are in writing and are filed with the Prothonotary or stated in the record in the presence of the Court.[21] Moreover, the Superior Court Criminal Rules provide that "in all cases not provided for by rule or administrative procedure, the court shall regulate its practice in accordance with the applicable Superior Court civil rule or in any lawful manner not inconsistent with these rules or the rules of the Supreme Court." [22] While the aforementioned rules do not expressly apply to an agreement between a criminal defendant and the State, we think that the policy embedded in these rules applies to the circumstances in this case. To the extent possible, all agreements of this type should be in writing or made on the record before the court. This will greatly reduce the potential for after-the-fact confusion. More importantly, by spending the time necessary to reduce an agreement to writing, the parties can obviate the necessity for holding a hearing to determine whether an agreement exists and its terms, thereby saving several days of a judge's and the parties' time.

### IV.

For the foregoing reasons, this case is REMANDED to the Superior Court for further findings. Jurisdiction is retained.[23]

---

21. DEL. SUPER. CT. CIV. R. 90(c).

22. DEL. SUPER. CT. CRIM. R. 57(d).

23. DEL. SUPR. CT. R. 19(c).