**Donald COLE, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 425, 2004.**

Supreme Court of Delaware.

Submitted: Oct. 18, 2006.

Decided: March 12, 2007.

Reargument Denied April 4, 2007.

---

21. Del. Super. Ct. Civ. R. 90(c).

22. Del. Super. Ct. Crim. R. 57(d).

23. Del. Supr. Ct. R. 19(c).

Jan A.T. van Amerongen, Jr. (argued), and Michael C. Heyden (argued), Wilmington, DE, for appellant.

John R. Williams, Department of Justice, Dover, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice, for the Majority:

Pursuant to an agreement he thought he had with the State, the defendant-appellant, Donald Cole, gave a statement to a Deputy Attorney General implicating one of Cole's accomplices to a crime. The police confronted the accomplice with Cole's statement. Cole asserts that the agreement he had reached before making his statement prohibited the State from using the statement for any purpose other than determining whether the State would seek the death penalty. On the basis of the alleged agreement, as he claims to have understood it, Cole moved to suppress all evidence obtained from the State's use of his statement, including his accomplice's testimony. A Superior Court judge denied the motion. Cole appeals this decision, as well as her decisions to admit a Section 3507 statement and a window screen into evidence. Because the trial judge's factual findings are supported by the record, and because it does not appear that she abused her discretion, we must affirm the denial of Cole's motion to suppress evidence derived from his statement. We also affirm the trial judge's exercise of discretion when she admitted the Section 3507 statement and the window screen into evidence.

## FACTS AND PROCEDURAL HISTORY

On December 3, 2001, the State charged Donald Cole and Elwood Hunter with attempted murder, robbery and related charges arising from an incident that occurred on August 22, 2001, at 1348 Lancaster Avenue in Wilmington. The two men allegedly entered the house with handguns, intending to steal money and drugs. When the occupants discovered the intruders, a fight ensued and Cole and Hunter allegedly shot two of the occupants.

Before the trial for the conduct that occurred at 1348 Lancaster Avenue, the Deputy Attorney General assigned to prosecute the case filed a motion *in limine*, seeking to admit evidence about a double homicide that had occurred on August 31, 2001, at 105 East 23rd Street in Wilmington. No one had been charged with the murders at that time, but the motion proffered that ballistics evidence would show that the firearms used in the attempted murder at 1348 Lancaster Avenue were the same as those used in the murders at 105 East 23rd Street. The motion *in limine* also proffered that the State would

produce a witness who would testify to having seen both Cole and Hunter near the alley behind 105 East 23rd Street, armed with handguns on the night of August 31, 2001. The trial judge denied the State's motion.

During the "1348 Lancaster Avenue" trial, the State did not produce any witness who identified Cole. The State, however, did produce an eyewitness who identified Hunter as one of the assailants in the attempted murder. That witness testified that she was so sure of her identification, that her level of certainty was an eleven on a zero to ten scale.

Cole, however, knew that the witness had mistakenly identified Hunter. In an effort to exonerate Hunter, Cole informed his trial attorney, Brian Bartley, that he would plead guilty to the charges in the 1348 Lancaster Avenue case if the State would drop its prosecution of Hunter. Bartley advised Cole not to plead guilty and told him that the State's case against him was weak. Bartley also advised Cole that, if he pled guilty to the charges in the 1348 Lancaster Avenue case, the State, based on the ballistics evidence proffered in the motion *in limine*, likely would charge Cole with the 105 East 23rd Street murders and seek the death penalty.

Despite Bartley's advice, Cole was determined to exonerate Hunter. On January 13, 2003, during a break in the trial, Bartley told the DAG that Cole wanted to give a statement exonerating Hunter. Bartley sought to strike a deal with the DAG in which the State would not seek the death penalty in the 105 East 23rd Street murders. In exchange for not seeking the death penalty, Cole would plead guilty to the 1348 Lancaster Avenue charges, and would give a full statement regarding both the 1348 Lancaster Avenue and the 105 East 23rd Street incidents. The DAG told Bartley that he was interested in this deal,

but he would have to take Cole's offer to "the senior staff" in the Attorney General's office before he could confirm the deal.

The senior staff met on the morning of January 14, 2003, to discuss Cole's offer. The trial judge, however, refused to delay the ongoing trial, so the trial continued with the State and the defense resting by midday on January 14. After a lunch break, the DAG and Bartley resumed their negotiations. They decided that Cole would confess to the attempted murder at 1348 Lancaster Avenue, and provide a statement regarding the 1348 Lancaster Avenue and 105 East 23rd Street crimes. Also, the DAG informed Bartley that the senior staff would not consider waiving the death penalty for Cole with regard to the 105 East 23rd Street murders until they knew the content and substance of Cole's statement. The DAG and Bartley, however, did not put any agreement in writing and have since disagreed about the terms of any such agreement.

Both Bartley and Cole believed that, in exchange for Cole's truthful statement, the State would not seek the death penalty for the 105 East 23rd Street murders. Bartley also believed that the DAG's comments before and after Cole's statement confirmed that the State would limit the use of Cole's statement to the senior staff's review and consideration of the death penalty. In other words, Bartley believed that the trial DAG had represented that he would present Cole's statement to the senior staff so they could assess its truthfulness and that the State would not use Cole's statement for any other purpose.

On the afternoon of January 14, 2003, Cole, pursuant to what he now asserts was his understanding of the agreement, gave an audiotaped statement regarding the two cases. At the beginning of Cole's statement, the DAG told Cole that:

the deal right now is that we are going to take uh a [proffer] statement of what you have to say about anything we ask you about and I'm going to take that statement back to my superiors and discuss with them whether to make you an offer where you would be spared capital punishment. Do you understand that?

The DAG proffered no other use of the statement before Cole began to speak.

Cole responded that he understood. Cole then admitted his involvement in the 1348 Lancaster Avenue attempted murder, provided a detailed statement of the incident, including how he gained entry into the residence,[1] and identified his accomplice. Cole also gave a detailed statement concerning the 105 East 23rd Street murders and implicated Travanian Norton and Larry Johnson as his accomplices. At that time, the State had no evidence linking Norton to the 105 East 23rd Street murders. At the end of the interrogation, the following exchange occurred between the DAG and Cole:

> [DAG]: We'll we'll [sic] terminate this and uh I'm gonna go back to my office and do what I told you I was gonna do [at] the beginning of this interview. Okay and uh obviously this conversation is not over we'll pick it up. Plus you don't want us to discuss the substance of this outside this room. *Yeah we're not gonna talk about this with Sticky or Larry Johnson or anybody else.* I I [sic] understand what you're saying, but listen why this is still ongoing there's a reason why we we [sic] want that. We know what you're saying to us and we *we're [sic] gonna hold up our end.* But listen we can't have anybody [know] it

the less people know the less it's gonna leak out there. (emphasis supplied)

> Cole: I think Sticky already knows.
>
> [DAG]: Why do you know that?
>
> Cole: Cause we talked.
>
> [DAG]: Alright well let's not from now on don't talk about it.

That same afternoon, Cole pleaded guilty to the 1348 Lancaster Avenue attempted murder. Cole's statement exonerated Hunter of the Lancaster Avenue crimes and the State never charged Hunter with the 105 East 23rd Street murders.

The police later took Norton into custody for other reasons. While Norton was in custody the police played a portion of Cole's statement to him. After listening to Cole's statement and realizing that Cole had implicated him in the 105 East 23rd Street murders, Norton made a deal with the State, gave a statement implicating Cole in the murders, and agreed to testify against Cole in return for leniency. Norton was the only witness who identified Cole as a perpetrator in the 105 East 23rd Street murders; other eye-witnesses to the crime either could not positively identify Cole or said that Cole was not involved.

The State ultimately decided to indict Cole for the 105 East 23rd Street murders and seek the death penalty. Before trial, Cole, in an effort to enforce his agreement with the State, filed a motion to prevent the State from seeking the death penalty. Cole argued that the State should be precluded from seeking the death penalty because he gave a true and complete incriminatory statement to law enforcement authorities. The trial

1. Cole informed the State that he and his accomplice had gained entry into 105 East 23rd Street by slicing the screen of an upstairs window; the police, theretofore, had been unable to determine either the point of entry or how entry had been made. Based on the information Cole provided, the police returned to 105 East 23rd Street and found a slit screen.

judge held an evidentiary hearing and denied Cole's motion. She found that:

> [t]he transcript contains no promises about benefit to Cole as a result of the proffer, other than [the trial DAG's] willingness to consider the information and review [Cole's] request again with the senior staff. Notwithstanding Cole's assertions otherwise, it appears that it was not until after the proffer that a misunderstanding developed.

Cole then filed a pretrial motion to suppress his January 14, 2003 audiotaped statement, and any and all evidence derived from that statement, from use at trial. The trial judge, in a July 2, 2004 oral ruling in chambers, denied Cole's motion to suppress. She stated that:

> I reviewed the statement that was taken by the State. The statement was taken with counsel present, it was taken against advice of counsel, and it was taken voluntarily because Mr. Cole wanted to give it.
>
> And the motion to suppress. The State restricted itself to the sole purpose of deciding whether to proceed non-capitol [sic]. In fact, *as I review this, the only thing that the State committed itself to—it didn't say what it would do, it said it wouldn't use the statement at trial.* In other words, it would comply with the requirements of [Delaware Rule of Evidence] 404. (emphasis supplied)

The only restriction the State imposed on itself was the restriction that the Rules of Evidence imposed on the State and that is, not to use the defendant's statement unless the defendant testified inconsistent with that at trial, which is what [Delaware Rule of Evidence] 410 says.

So at this point, there being no further record presented to me, and the defendants having ample opportunity to explore this I'm going to deny the motion to suppress.

Eventually, a jury convicted Cole after a joint trial with his codefendant, Larry Johnson. Although the State sought the death penalty, Cole did not receive the death penalty. The State did not play Cole's January 14, 2003 statement at trial. However, Norton did testify as the State's primary witness.

On September 14, 2005, Cole appealed his conviction to this Court, arguing that the trial judge erred by denying his motion to suppress his statement and evidence derived from that statement, including Norton's testimony. At that time, we were unable to reach a conclusion and remanded the case to the trial judge, but retained jurisdiction so that she could make her factual findings with respect to Cole's motion to suppress more explicit.[2] In so doing, we asked the trial judge to consider several specific questions.[3]

---

2. *Cole v. State*, 2005 WL 2805562 (Del. Oct. 20, 2005).

3. *Id.* at *8. Specifically, we asked the trial judge to consider the following:

1. Did Cole and [the DAG] enter impliedly or explicitly into any agreement before the proffer limiting the State's use of Cole's statement to consideration of death penalty eligibility?
2. What does [the DAG's] statement at the end of Cole's interrogation signify?

a. Does it further clarify the deal, if any, between the parties that existed before the proffer? Or does it relate only to Cole's concern that other people involved in a homicide might find out about it and then come after him, or "do something else?"
b. In either case, what is the significance of the prosecutor saying one thing ("we won't talk about this with anyone else") and authorizing the police to do the opposite (confronting Norton and Johnson with Cole's statement)? More specifically, did the parties have any reason to believe that

In her decision on remand, the trial judge carefully answered each of our four questions.[4] She found, *inter alia,* that before the proffer, Cole and the trial DAG agreed that Cole's statement would be used in two ways: (1) "to determine whether the State would dismiss the charges against Hunter" and (2) "to evaluate the propriety of waiving the death penalty in connection with the prosecution of the 23rd Street double murders."[5] The trial judge also addressed the trial DAG's statement at the end of Cole's interrogation that "we're not gonna talk about this with Sticky or Larry Johnson or anybody else." She found that "the agreement before and after the proffer was that the only limitation on the use of the statement was D.R.E. 410," and that "[t]he State did not breach the deal with Cole."[6] Finally, in assessing whether Cole detrimentally relied on any promise by the State to use his statement only for a limited purpose, the trial judge concluded that "Cole gave his statement because he felt a 'moral imperative' not to let Hunter be convicted of Lancaster Avenue, or charged with 23rd Street."[7]

Having retained jurisdiction, we now revisit Cole's claims on appeal.

the bargain into which they entered before Cole made his statement included a limitation on its use and did the State violate the implied covenant of good faith and fair dealing by acting contrary to Cole's reasonable expectation of the "deal?"
c. Did the prosecutor misrepresent how the State would use Cole's statement?
3. Did Cole detrimentally rely on the State's promise to use his statement for a limited purpose, if it did so promise before the proffer, before making his statement?
4. If an agreement existed and Cole relied on it to his detriment, and the State breached the agreement, what remedy applies? Would specific enforcement of the agreement require a new trial or, given the weight of the evidence, would Cole have been convicted without Norton's testimony?

## I. The trial judge did not abuse her discretion by refusing to suppress evidence derived from the use of Cole's statement.

■ Based on his asserted belief that the trial DAG would not share his statement with anyone else, Cole provided a statement that exonerated a wrongfully accused codefendant and implicated one of his accomplices, Travanian Norton, in the 23rd Street murders. Breaking the State's promise as Cole understood it, a State investigator confronted Norton with Cole's statement. Realizing that Cole had implicated him in the crime Norton made a deal with the State, gave a statement implicating Cole in the crime, and testified for the State in return for leniency. The police possessed no other evidence linking Norton to the crime. Similarly, Norton was the only witness who unequivocally identified Cole as a perpetrator in the 23rd Street murders at trial.

■ On appeal, Cole argues that the trial judge should have suppressed evidence derived from his audiotaped statement. Cole likens his statement to state-

4. *Cole v. State,* 2006 WL 1134222 (Del.Super.Mar.14, 2006).

5. *Id.* at *1.

6. *Id.* at *2–5. She did not discuss any inference that might be drawn from the DAG's precatory remarks about how the State would use the statement before Cole began to give his statement. The Chief Investigating Officer in the case, present at the time the DAG preliminarily stated the scope of use, specifically asked the DAG if the statement *could* be used beyond the use represented before Cole began to give his statement before confronting Norton with Cole's statement. The trial judge found no apparent relevance to the officer's query.

7. *Id.* at *5.

ments made during the course of plea negotiations, which are typically not admissible in court.[8] The justice system seeks to encourage plea negotiations in order to expedite case resolution by fostering "candor which is essential for effective plea negotiations."[9] Cole argues that the rationale for not admitting plea negotiations similarly applies to his statement. Neither Cole nor his counsel contemplated that the State would use his statement to further its case against Cole. Cole urges that to uphold the trial judge's admission of evidence derived from his statement would chill plea negotiations, as defense attorneys will not permit their clients to provide statements when there can be no limit to the scope of their use. Not surprisingly, Cole believes that the candor essential for effective plea negotiations must be observed by both sides in any negotiation.

■ We review the trial judge's refusal to grant a motion to suppress evidence for an abuse of discretion.[10] Because the record, as further explored and expounded upon on remand, reveals that the trial judge did not abuse her discretion, we hold that the trial judge properly admitted evidence derived from Cole's statement.

As mentioned, when we first received Cole's appeal, we remanded the matter to the trial judge for explicit findings regarding the nature of the agreement made between Cole and the State.[11] We posed specific questions which reflected our grave concerns about the relative candor of the parties to the plea negotiations. The trial judge on remand provided answers based on her view of the record.

Concerning the parties explicit or implied limits upon the State's use of Cole's statement, the trial judge found that the parties had agreed before the proffer that Cole's statement would be used in two ways: (1) "to determine whether the State would dismiss the charges against Hunter" and (2) "to evaluate the propriety of waiving the death penalty in connection with the prosecution of the 23rd Street double murders."[12] The trial judge focused on the context in which Cole provided the statement to reach this conclusion: the Lancaster Avenue trial was drawing to a close and an eye-witness for the State had incorrectly identified Hunter as the perpetrator. Under these conditions, Cole volunteered a statement in order to exonerate his wrongfully charged codefendant. Moreover, Cole was aware that the trial DAG would be taking his statement to his superiors, and that, if his statement checked out, the State would not seek the death penalty should they charge him in the 23rd Street homicides. Because the

---

8. DEL. R. EVID. 410 ("Except as otherwise provided in this rule, evidence of a plea of guilty later withdrawn with court permission, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.").

9. *State v. Patterson*, 1997 WL 720719 (Del.Super.1997).

10. *Gregory v. State*, 616 A.2d 1198, 1200 (Del. 1992); *Virdin v. State*, 780 A.2d 1024, 1030 (Del.2001).

11. *Cole v. State*, 2005 WL 2805562 (Del. Oct. 20, 2005).

12. *Id.* at *1.

State would need to corroborate his statement in order to determine its truth, the trial judge concluded that Cole should have been, and therefore had to be aware, that the State would not limit its use of his statement to the "senior staff's" consideration of whether to seek the death penalty.

On remand, the trial judge also addressed the trial DAG's comment at the end of Cole's interrogation that "we're not gonna talk about this with Sticky or Larry Johnson or anybody else." Based upon (i) email correspondence between the trial DAG and Bartley discussing any agreement; (ii) Cole's December 4, 2003 affidavit in which he fails to assert that the State's use of his statement was in any way limited;[13] (iii) Cole's knowledge that the State would "check out" his statement in order to determine its veracity; and, (iv) the trial DAG's testimony under oath regarding why he made the comment, the trial judge determined that "the State's interest in not talking to Sticky or Larry Johnson was related to Cole's personal security."[14] She buttressed her conclusion by noting the context of the trial DAG's comment and Cole's reaction, "I think Sticky already knows." She rationalized that Cole's reaction illustrates that Cole understood that the trial DAG's statement related to avoiding possible retribution from his codefendants and to protecting his personal security, rather than as a limitation on the State's ability to corroborate Cole's statement. Moreover, the trial

judge noted the fact that Cole's attorney, Bartley, was present when the trial DAG made this comment and did not seek to clarify the comment—evidence that Bartley did not share Cole's misunderstanding.

Overall, the trial judge focused on Cole's understanding that the State needed to verify his statement before it would forgo seeking the death penalty. Cole understood that his statement needed to be "checked out." The trial judge notes that the very idea of corroboration belies an agreement to limit use of Cole's statement.[15] As she put it, "[t]he logical way to corroborate Cole's statement was to return to the scene of the crime to collect additional evidence, and to confront the other perpetrators of the crime with his statement." In so concluding, the trial judge determined that "the agreement before and after the proffer was that the only limitation on the use of the statement was D.R.E. 410," and that "[t]he State did not breach the deal with Cole."[16]

Finally, when the trial judge assessed whether Cole detrimentally relied on any promise by the State to use his statement only for a limited purpose, the trial judge found that "Cole gave his statement because he felt a 'moral imperative' not to let Hunter be convicted of Lancaster Avenue, or charged with 23rd Street."[17] Implicitly, Cole, the perpetrator of one attempted murder and two actual murders, suddenly found himself driven by "moral impera-

---

**13.** A limit on the State's use of Cole's statement is not supported by Cole's December 4, 2003 affidavit written in support of his motion to preclude the death penalty. Therein, Cole states that his understanding was that "the State would ... *check* [his] statement to see if it was true" and that a "truthful statement would spare [him] the death penalty." *Id.* at *3 (emphasis added). By this time, Cole knew that the State had played his statement to Norton, yet the affidavit does not claim misuse of Cole's statement. To the contrary,

Cole admits that he knew his statement would be "checked out." The trial judge relied heavily on this statement made under oath in her analysis of the record. *Id.* at *3–4.

**14.** *Id.* at *4.

**15.** *Id.* at *5.

**16.** *Cole v. State*, 2005 WL 2805562 at *2–5.

**17.** *Id.* at *11.

tive," and not by self interest linked to limiting the State's use of his incriminating statement.

Because the trial judge's factual findings and her credibility determinations are supported by the record, and because it does not appear that she abused her discretion when she reached the conclusions that she did, we, despite serious misgivings after our review of the record, affirm the trial judge's denial of Cole's motion to suppress evidence derived from his statement. Though we are disturbed by the possibility that the State had been less than candid in its representations to Cole, we cannot conclude that the trial judge's factual findings are clearly erroneous. Finally, we note that Cole provided his statement against the clear and unequivocal advice of his attorney. We believe the record does support a view that Cole would have offered his statement even without a promise from the State to limit its use in order to exonerate Hunter.

We respect the minority's thoughtful analysis so well articulated in their joint dissent. First, we believe the trial judge's finding that Cole as well as the State understood that Cole's statement would have to be independently corroborated before the "fives" would consider it in the mix for purposes of waiving the death penalty is supported by the testimony heard live by the trial judge and by Cole's own sworn affidavit. We should and do defer to the trial judge's findings based upon her firsthand credibility assessments.

Second, the record evidence does not reflect that the State "promised Cole that it would not seek the death penalty if Cole gave his proffered statement and if the statement was independently corroborated." All the DAG professed to do was to bring Cole's statement to the attention of

the "fives" and if it were independently corroborated, the "fives" would consider it among all the other factors that customarily are in the mix in determining whether to seek or waive the death penalty in a murder first degree prosecution. The trial judge so concluded and the record evidence supports that view.

We are compelled to stress that the parties easily could have avoided the confusion caused by the resulting misunderstanding by putting their agreement in writing or on the record *before* the proffer. To the extent possible, all agreements of this type should be in writing or placed on the record in open court or chambers. Documenting agreements or "deals" in this way will greatly reduce the potential for after the event confusion. More importantly, by spending the limited time necessary to reduce an agreement to writing, parties can obviate the need to hold a hearing to determine whether an agreement exists and its terms, thereby saving several days of the courts' and the parties' time.

## II. The trial judge did not err when she admitted prior out of court statements under Section 3507.[18]

■ Cole argues that the trial judge committed legal error when she permitted the jury to hear out of court statements not subject to cross examination. He maintains that, in light of *Crawford v. Washington*,[19] the judge effectively denied him his right to confront his accuser because his accuser could not recall making the earlier out of court statements.

The State tried Cole and Larry Johnson jointly for the 105 East 23rd Street homicides. After Johnson took the stand in his own defense and denied his involvement in the crime, the State presented Bessie

18. 11 *Del. C.* § 3507.

19. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Warner as a reluctant rebuttal witness. She testified that she had overheard a conversation between Cole and Johnson in 2001 regarding a robbery and shooting. When the State inquired into the specifics of the conversation, Warner testified that she could not recall the substance of the conversation she overheard. The State then interrupted her testimony to present her earlier out of court statement to Detective Chaffin under *11 Del. C. § 3507.*[20]

At that time, Johnson objected to this testimony and claimed that its introduction violated his confrontation rights. Johnson raised this claim on his appeal to this Court on May 24, 2005. We addressed Johnson's confrontation claim in an opinion issued July 1, 2005.[21] We held that the trial judge properly admitted the Section 3507 statement and that the use of the statement did not deny Johnson his confrontation rights. Because we have ruled on the issue Cole presents to us on appeal, *stare decisis* compels us to rule consistent-ly here. As a result, Cole's confrontation claim fails.

### III. The trial judge did not abuse her discretion by admitting a window screen found 18 months after the crime occurred.

■ Cole argues that the trial judge abused her discretion when she admitted a

screen investigators collected from the 105 East 23rd Street residence 18 months after the murders occurred. Cole specifically argues that the State's failure to authenticate the screen and establish its chain of custody at trial diminished the probative value of the screen and, as a result, prejudice from the screen's admission substantially outweighed its evidentiary value.[22]

■ We review the trial judge's determination that the State sufficiently identified and authenticated an item of physical evidence for an abuse of discretion.[23]

■ Delaware Uniform Rule of Evidence Rule 901 requires adequate authentication or identification of evidence as a condition precedent to the admissibility of physical evidence.[24] In order to satisfy this condition, the evidence must meet the two pronged standard we established in *Tricoche v. State*[25]: (1) the foundation witness must state that the instrumentality is at least like the one associated with the crime; and (2) the evidence must establish that the instrumentality is connected to the defendant and the commission of the crime.[26] As we noted in *Cabrera v. State,* however, "the burden of authentication is

---

**20.** 11 *Del. C.* § 3507.

**21.** *Johnson v. State,* No. 429, 2004, op. at 9–14 (Del. July 1, 2005).

**22.** Moreover, when we decided the direct appeal of Cole's codefendant, Larry Johnson, we addressed the issue of the screen's admissibility and held that there was "no abuse of discretion in the admission of the exhibit." Since Johnson and Cole were tried together and the State introduced the screen as a prosecution exhibit against both defendants, the doctrine of *stare decisis* now bars further litigation of this same issue. Because that finding was contained in a footnote without any analysis, we have decided to address this

claim more fully here. *See Johnson,* No. 429, 2004, op. at 4 n. 9.

**23.** *Cabrera v. State,* 840 A.2d 1256, 1263 (Del. 2004).

**24.** *See* DEL. R. EVID. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

**25.** 525 A.2d 151 (Del.1987).

**26.** *Id.* at 153.

easily met." [27] "The State must establish a rational basis from which the jury could conclude that the evidence is connected with the defendant. The link need not be conclusive. An inconclusive link diminishes the weight of the evidence but does not render it inadmissible." [28]

Here, the State offered into evidence a screen that investigators found in the backyard [29] of 105 East 23rd Street 18 months after the crime occurred. The investigator returned to the residence because Cole mentioned the screen in his statement. The State offered the screen to support the testimony of Travanian Norton who testified that Cole had entered the home via a second floor window above the porch roof. The State did not offer evidence to support that Cole removed a screen when he entered the home, or that this particular screen fit the window above the porch roof. Norton made no mention of a screen when he testified. At no point during their investigation did the police find Cole's fingerprints, or any other defendants' fingerprints, on the screen.

We agree with the State, however, that the "two slits or cuts in the bottom" of the screen and the remnants of black fingerprint powder still visible on the edges of the screen nearly three years after the crime [30] were distinctive characteristics that could lead a reasonable jury to conclude that the proffered screen was the same screen involved in the night of the shootings. Detective Chaffin testified that he retrieved the screen from 105 East 23rd Street, and that the screen had been in the State's custody and control since the time of its collection. Thus, the State provided a rational basis from which the jury could conclude that the evidence was connected to the defendant.[31] As a result, the trial judge properly admitted the screen into evidence.

## CONCLUSION

For the foregoing reasons, the judgments of the Superior Court are affirmed.

BERGER and JACOBS, Justices, dissenting:

We find ourselves unable to join in the majority opinion and would reverse, for two independent reasons. *First,* the agreement between Cole and the State was ambiguous on the question of whether or not it restricted the State from using Cole's statement for any purpose other than to consider whether to waive the death penalty. Because as a legal matter that ambiguity should have been resolved in Cole's favor, this Court is not required to, nor should it, uphold the trial court's contrary factual resolution under the deferential "clearly erroneous" review standard. *Second,* the outcome should be the same even if the trial court's factual find-

---

27. *Cabrera,* 840 A.2d at 1264–65.

28. *Id.*

29. There is conflicting testimony concerning from where Detective Chaffin collected the screen. During trial, Detective Chaffin indicated that he removed the screen from the window above the back porch roof. Defense counsel suggested that investigators had retrieved the screen from the backyard of 105 East 23rd Street. We do not believe that the exact location of the screen at the time of its retrieval has any bearing on its admissibility.

30. Police processed the screen for fingerprints on the night of the crime.

31. *See Tricoche,* 525 A.2d at 153: (1) the foundation witness must state that the instrumentality is at least like the one associated with the crime; and (2) the evidence must establish that the instrumentality is connected to the defendant and the commission of the crime.

ings were upheld. The State promised Cole that it would not seek the death penalty if Cole gave his proffered statement and if the statement was independently corroborated. Both of those conditions were satisfied, but the State breached its promise. In consequence, the trial court was obligated to remedy that breach in either one of two ways. The court could have either enforced the agreement, in which case the State would be precluded from seeking the death penalty. Or, failing that, the court could have declared the breached agreement as no longer valid and precluded the State from using Cole's statement and any evidence derived therefrom at the trial. Having determined not to grant the first remedy, the trial court was legally required to grant the second, and erred by declining to do so. What follows are the reasons that lead us to these conclusions.

## I.

Critical to the outcome reached by the majority is the trial court's factual finding that the State made no enforceable promise to limit its use of Cole's statement to presenting that statement to the Attorney General's senior staff, solely for the staff to consider whether to seek the death penalty. The majority concludes that because there is evidence of record which supports that finding, the finding is not "clearly erroneous" and must therefore be upheld. Respectfully, we cannot agree.

The majority's analysis overlooks the fact that the agreement is, at best, ambiguous as to what uses of Cole's statement were to be allowed. Unquestionably, the record permits the inferences ultimately drawn by the trial court in both its original ruling on Cole's motion to suppress and in its Opinion on Remand. But those inferences are only permitted; they are not mandated, because the same record also

supports diametrically opposite inferences and findings. It is undisputed that the trial court found, as fact, that the State promised not to use Cole's statement at trial as *direct* affirmative evidence of his guilt, unless Cole testified inconsistently. The State did not use Cole's statement as direct affirmative evidence. What the State did do, however, was use Cole's statement to obtain evidence *indirectly,* first by showing the statement to Trevanian Norton, and then entering into a plea agreement whereby Norton would testify at trial and inculpate Cole. But for the State having shown Cole's statement to Norton, Norton's testimony would never have been procured. The State, however, never obtained Cole's express consent to his statement being used in this manner. The question is whether Cole and his counsel should nonetheless be chargeable with having agreed in advance to this sleight of hand.

In other circumstances, perhaps they should be, but not here. In this case, DAG Miller explicitly told Cole, "Yeah, we're not going to talk about this [statement] with [Norton] or Larry Johnson or anybody else...." In such circumstances a person in Cole's (and his counsel's) position could reasonably have understood the State to be representing that it would not use the statement to do indirectly what it promised not to do directly. Indeed, the majority opinion confirms that was Cole's, and his counsel's, understanding:

> Bartley [Cole's counsel] believed that the DAG's comments before and after Cole's statement confirmed that the State would limit the use of Cole's statement to the senior staff's review and consideration of the death penalty. In other words, Bartley believed that the trial DAG had represented that he would present Cole's statement to the senior staff so they could assess its

truthfulness, *and that the State would not use Cole's statement for any other purpose.*[32]

In our view, the legal conclusion reached by the majority is incorrect, because on the question of whether Cole consented to his statement being shown to Norton, the evidence permitted a fact finder to draw contrary, opposite factual inferences. That is, on this issue the agreement between Cole and the State was ambiguous. The trial court resolved that ambiguity in favor of the State. In so doing the trial court erred, because in the context of a plea agreement[33], the better rule is that ambiguities must be resolved against the State and in favor of the defendant.[34] As the Sixth Circuit stated the rule in *United States v. Johnson:*

> This ambiguity must be construed against the government. Although plea agreements are contractual in nature, a defendant's underlying right of contract

is constitutional, and therefore implicates concerns in addition to those pertaining to the formation and interpretation of commercial contracts between private parties. Therefore, both constitutional and supervisory concerns require holding the government to a higher degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in the plea agreements.[35]

Despite their clearly expressed concern about the integrity of the process by which the agreement with Cole was carried out, the majority regard themselves as compelled to uphold the trial judge's findings, because those findings are not "clearly erroneous" and do not constitute an "abuse of discretion."[36] However appropriate those lenient review standards may be in other contexts, they are not applicable here, because the subject of judicial scruti-

---

**32.** Majority opinion, at 367 (italics added).

**33.** Although the agreement between Cole and the State was not a plea agreement in the technical sense (because the charges growing out of the 23rd Street homicides would be the subject of a murder trial), that agreement was the functional equivalent of a plea agreement, because it involved a matter of the utmost importance that would certainly form part of any plea agreement: whether the State would seek the death penalty in the event of a murder charge arising out of Cole's statement. Being functionally indistinguishable from a plea agreement, the rules governing the construction of plea agreements should be applied to the agreement at issue here.

**34.** See, *United States v. Feigenbaum,* 962 F.2d 230, 234 (2d Cir.1992); *United States v. Johnson,* 979 F.2d 396, 399 (6th Cir.1992); *Craig v. People,* 986 P.2d 951 (Colo.1999); *State v. Wills,* 244 Kan. 62, 765 P.2d 1114, 1120 (1988); *State v. Bethel,* 110 Ohio St.3d 416, 854 N.E.2d 150, 167 (2006); *State v. Mares,* 119 N.M. 48, 888 P.2d 930, 934 (1994) (allowing ambiguities to be resolved in favor of the defendant but limiting doctrine); *State v. Bis-*

*son* 156 Wash.2d 507, 130 P.3d 820, 827 (2006); *People v. Toscano,* 124 Cal.App.4th 340, 345, 20 Cal.Rptr.3d 923 (Cal.App.2004); *State v. Rosado,* 92 Conn.App. 823, 887 A.2d 917, 919 (2006); *State v. Shorter,* No. C4–94–2442, 1995 WL 147064, at *5 (Minn.Ct.App. Apr. 4, 1995).

**35.** 979 F.2d at 399 (internal quotations omitted).

**36.** The majority holds that:

> Because the trial court's factual findings and her credibility determinations are supported by the record, and because it does not appear that she abused her discretion when she reached the conclusions that she did, we, *despite serious misgivings after our review of the record,* affirm the trial judge's denial of Cole's motion to suppress evidence derived from his statement. Though we are disturbed by the possibility that the State had been less than candid in its representations to Cole, we cannot conclude that the trial judge's factual findings are clearly erroneous.

Majority opinion, at 372–73 (italics added)

ny is an ambiguous agreement functionally analogous to a plea agreement. Because the trial judge was required to, but did not, resolve the ambiguity in favor of Cole, her fact findings cannot stand as a matter of law. Therefore, those findings cannot be accorded any deference, let alone the deference called for under the clearly erroneous standard.

## II.

There is a second, independent ground for reversal. The agreement between the State and Cole, which was the functional equivalent of a plea agreement, must be construed as an implicit promise by the State not to seek the death penalty in connection with the 23rd Street homicides, if two conditions were satisfied. First, Cole must provide a statement relating to (inter alia) the 23rd Street homicides. Second, the substance of Cole's statement must be independently corroborated by the State. As a legal matter *United States v. Bowler*[37] requires the recognition of such an implicit promise, and as a factual matter the majority recognizes that Cole understood that such a promise had been made. As the Seventh Circuit stated in *Bowler*:

> The inclusion in the agreement of the language would serve no purpose unless construed to contain an implicit promise to consider the specified factors, for the Government had the authority to consider such mitigating factors even without the assent of the defendant. . . . The Government will not be allowed to avoid the obligation it thus incurred by claiming now that the language literally promises nothing to the defendant. A plea agreement is not an appropriate

context for the Government to resort to a rigidly literal approach in the construction of language.[38]

Consistent with that observation, the majority finds:

> Moreover, Cole was aware that the trial DAG would be taking his statement to his superiors and that, if his statement checked out, the State would not seek the death penalty should they charge him in the 23rd Street homicides.[39]

Without that implicit promise, the agreement between the State and Cole would be empty and illusory from Cole's standpoint. Without that promise, Cole would have had no reason or inducement to put himself in jeopardy of a murder conviction. For this reason that promise acquired legal force, and the State became duty bound to honor it. As the United States Supreme Court has recognized, where, as here, ". . . a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."[40]

The State's promise, however, was not fulfilled. Although Cole gave an incriminating statement and although that statement was fully corroborated, Mr. Miller, the Deputy Attorney General who made that promise on behalf of the State, never recommended that the senior staff of the Attorney General's office "take the death penalty off the table," and the prosecution never did. Instead the State, after indicting Cole for the 23rd Street murders, sought the death penalty, which prompted Cole to seek an order from the Superior Court preventing the State from doing that. The trial court denied the motion, on

37. 585 F.2d 851 (7th Cir.1978).

38. *Id.* at 854.

39. Majority opinion at 372.

40. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

the basis that "[t]he transcript contains no promises about benefit to Cole as a result of the proffer, other than [the trial DAG's] willingness to consider the information and review [Cole's] request again with the senior staff." That ruling, we submit, was legally erroneous, because it refused to recognize or enforce the State's implicit promise to Cole that, once having satisfactorily corroborated Cole's statement, the State would take the death penalty off the table.

This error is critically important to the analysis of the issue before us, because once the State breached its agreement not to seek the death penalty, Cole would have been entitled to one of two alternative remedies. The trial court could have either: (1) enforced the agreement and granted Cole's motion to preclude the State from seeking the death penalty; or (2) alternatively, voided and rescinded the agreement in its entirety, if the agreement was not to be enforced. In the latter case, the State would have been free to seek the death penalty, but would forfeit its right to use Cole's statement *or any evidence derived therefrom* in prosecuting Cole for the 23rd Street homicides.

The trial court was required to grant one remedy or the other. What it could *not do was deny both*. Having determined not to grant Cole's motion to preclude the death penalty, the trial court was legally required to suppress Cole's statement and any evidence derived therefrom. By not granting that alternative remedy, the trial court reversibly erred on this basis as well.[41]

41. It is no answer to argue that the denial of the motion to preclude the death penalty created no prejudice because the trial court and the jury ultimately determined that Cole would not suffer the death penalty. That fact was unknowable at the time the motion was decided, and cannot be the basis to deprive Cole, on the basis of hindsight, of the alternative remedy, namely, invalidation of the agreement and forfeiture by the State of its right to use Cole's statement and evidence derived therefrom.

For these reasons we respectfully dissent.