Edwin R. SCARBOROUGH, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 328, 2006.

Supreme Court of Delaware.

Submitted: Feb. 6, 2008.
Decided: Feb. 26, 2008.

Bernard J. O'Donnell, Office of the Public Defender, Wilmington, Delaware, for appellant.

John R. Williams, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

STEELE, Chief Justice.

This case involves a plea agreement and an agreement to work undercover gone haywire. Police arrested defendant-appellant, Edwin Scarborough, on various drug charges in 2004. Over a year's time, Scarborough, on several different occasions, promised to help police investigate several different drug dealers in exchange for sentencing leniency. In September 2005, after several earlier attempts to provide information failed, Scarborough wrote a "jail-house" letter to the prosecutor identifying several people about whom he could provide information. This letter prompted the prosecutor to offer a plea agreement—part written and part oral. Yet despite the strictures of *Superior Court Rule 11(c)*, which requires, at least, *in camera* disclosure of the entire plea agreement, at the time the parties proffered the plea they only presented the written part of the plea agreement to the Superior Court.

The written plea agreement provided that Scarborough would plead guilty and testify against his two co-defendants. The oral part of the agreement included Scarborough's promise to work as an informant and the State's promise to withhold a petition seeking to have Scarborough declared a habitual offender. When Scarborough's attempts to provide information failed to satisfy the police, the State petitioned to have Scarborough declared a habitual offender. Scarborough then attempted to withdraw his guilty plea. A Superior Court judge denied Scarborough's motion on the basis of the written plea agreement, Scarborough's oral representations in court, and the positions counsel for both parties took on the record. The trial judge did not consider the terms of the previously undisclosed oral agreement and his written opinions to date suggest that he refuses to acknowledge that an oral "side" agreement ever existed.

We heard oral argument and remanded this case with instructions to the Superior Court judge to determine "what the exact terms of the oral side agreement were, whether Scarborough fulfilled or could realistically have fulfilled those terms, or whether any factual issue raised by the oral side agreement resulted in Scarborough's 'misapprehension' about the effect of his guilty plea." [1]

Despite our instructions, the judge's order entered after the hearing on remand never addressed the first question posed to him, *i.e.* "what the exact terms of the oral side agreement were . . . ." At oral argument on appeal, the State and Scarborough's counsel readily admitted that the parties had reached an oral agreement at the time of Scarborough's plea and that they did not disclose the oral agreement's existence or its terms at the time Scarborough pleaded. Because neither party questioned the existence of the agreement, the Superior Court judge's task was to determine its terms and the facts that established either fulfillment or non-fulfillment of the bargain. Rather than addressing that question, the judge determined that Scarborough never entered into an enforceable contract with the State that he could ultimately perform. The Superior Court judge again, on remand, denied Scarborough's motion to withdraw his guilty plea.

To decide that Scarborough failed to perform an agreement without first determining what Scarborough, in fact, agreed to do defies logic. By failing to adhere to our direction on remand, the Superior Court judge abused his discretion. It now falls to us to attempt, as best we can, to glean the terms of the oral agreement from the testimony at the hearing on remand.

After reviewing the record, we find that the State and Scarborough reached an oral agreement that supplemented the written plea agreement. The oral agreement provided that: (1) Scarborough would "work" [2] and provide information about other drug dealers; and, (2) the State would not seek habitual offender status. In prosecutorial parlance, "work" refers to a defendant cooperating with police to collect information about others engaged in criminal activity, typically in exchange for sentencing leniency. In the nebulous world of Delaware drug enforcement coop-

1. *Scarborough v. State,* 938 A.2d 644 (Del. 2007).

2. *E.g.,* in Oliver Stone's movie *Wall Street,* Charlie Sheen's character, Bud Fox, agrees to "work" and help provide information about the reviled Gordon Gekko (Michael Douglas's character) after Fox is arrested for violating securities laws. Fox "works" for the SEC when he confronts Gekko in a rainy Central Park, wearing a wire, and records Gekko's incriminating statements.

eration agreements, what constitutes "work" appears to be whatever the police say it is after the prosecutor, defense counsel, and the defendant have agreed that "working" with the police merits a more favorable plea agreement than that previously proffered. In this case the parties who "drafted" the oral agreement for Scarborough to "work" in exchange for avoiding sentencing as a habitual offender, left defining the critical term "work" to the police who did not participate in crafting the oral agreement. Sadly, neither did the Superior Court judge whom the parties' counsel kept in the dark either intentionally or carelessly by their failure to adhere to Superior Court Rule 11(e)(2).

We find here that the State, in contradiction to its implied duty to act in good faith, unreasonably rejected the "work" that Scarborough proposed. Accordingly, the State excused Scarborough from performing. Although Scarborough now seeks to withdraw his guilty plea, the more appropriate remedy is to enforce specifically the State's promise to withhold petitioning for habitual offender status. Therefore, the Superior Court judge's decision denying Scarborough's request to withdraw his guilty plea is **AFFIRMED**, Scarborough's sentence is **VACATED**, and the case **REMANDED** for resentencing.

### FACTS AND PROCEDURAL HISTORY

#### 1. *Scarborough's Guilty Plea* [3]

In September 2005, Scarborough pleaded guilty to two counts of maintaining a vehicle for keeping controlled substances, one count of tampering with physical evidence, and one misdemeanor count of resisting arrest. He agreed to two conditions in his written plea agreement: first, Scarborough would testify truthfully against two co-defendants; and second, he would submit to substance abuse treatment.

During the plea colloquy between Scarborough and the Superior Court judge taking the plea, the judge explained that Scarborough could potentially face life imprisonment if the State successfully moved for habitual offender status. Scarborough stated that he understood the potential for a life sentence. Based on *Superior Court Rule 11(e)(1)(B)*, the judge asked Scarborough, "Are you aware that the Court is not bound by any agreements that you have made with the prosecutor up to this point or up through sentencing, regarding sentencing?" Scarborough replied, "Yes, I do."

The judge then reviewed the Truth–in–Sentencing Guilty Plea Form with Scarborough. On the Plea Agreement Form, Scarborough marked the "habitual offender" block and a handwritten note on his Truth–in–Sentencing Guilty Plea Form stated "if defendant is habitual, potential 0–life." Scarborough acknowledged that he waived his constitutional trial rights and confirmed that the written plea agreement contained his entire agreement with the State. Even after hearing Scarborough's response acknowledging the written agreement to be the "entire" agreement, the prosecutor and Scarborough's counsel both represented that they knew of no reason not to accept the plea. In fact, as both have acknowledged, they knew of an oral "side" agreement that could directly affect the possibility that Scarborough could be declared a and sentenced as a habitual offender. The judge accepted Scarborough's plea.

Scarborough failed to appear at his first scheduled sentencing hearing. The State then moved to have Scarborough declared a habitual offender pursuant to 11 *Del. C.*

---

**3.** A more detailed review of the facts surrounding Scarborough's guilty plea can be found in our April 26, 2007, Opinion. *Scarborough,* 938 A.2d at 644.

4214(a). At the second scheduled sentencing hearing, Scarborough argued that the State should not have filed a habitual offender petition and moved to withdraw his guilty plea. At this hearing, the judge appointed new counsel for Scarborough and scheduled a hearing on Scarborough's motion to withdraw his guilty plea.

At a March 2006 hearing, Scarborough's new counsel argued that Scarborough should be able to withdraw his guilty plea because the prosecutor and Scarborough made an off-the-record oral "side" agreement in which the State promised not to petition for habitual offender status in exchange for Scarborough's agreement to "work" with police in an investigation. The judge noted that the plea agreement contained no reference to any other agreements, that it specifically contemplated the possibility that the State might seek habitual offender status, and that Scarborough confirmed under oath that it was the entire agreement. The judge denied Scarborough's motion to withdraw his guilty plea without considering any factor outside the written agreement and the parties' in court representations. Scarborough appealed that decision.

## 2. *Scarborough's First Appeal*

We heard Scarborough's appeal in March 2007. At oral argument, both Scarborough's counsel and the State represented that part of Scarborough's plea agreement did indeed include an oral "side" agreement that neither side had disclosed to the trial judge, despite the strictures of

**4.** *Scarborough*, 938 A.2d 644 (Del.2007).

**5.** *State v. Scarborough*, 2007 WL 2319777 (Del.Super., 2007).

**6.** We are uncertain about how we should interpret the judge's first clause in this sentence, "if there ever *were* an agreement." There are two possible interpretations. First, if the judge intended to use the subjunctive

*Superior Court Rule 11(e)(2)*. That rule requires, at a minimum, *in camera* disclosure and record evidence of nonpublic oral agreements at the time the plea is offered. Given (i) this concession, (ii) the fact that the judge taking the plea did not know of the side agreement, (iii) the nebulous nature of the term "work," (iv) the fact that what constituted acceptable "work" was left to be decided by police who were not involved in crafting the agreement, and (v) the consequences that flow from habitual offender treatment, we remanded and directed the judge to establish a factual record and determine the terms of the oral agreement.[4]

## 3. *The Hearing on Remand and Order*

Four witnesses testified at the evidentiary hearing: Scarborough, Robert O'Neil (Deputy Attorney General who negotiated the plea); David Hake (the police officer who worked with Scarborough); and Sandra Dean (the public defender who negotiated the plea agreement for Scarborough). After the hearing, the judge denied Scarborough's motion to withdraw the guilty plea.[5]

In his Order, the judge quickly concludes "if there ever were an agreement, and if its performance would have brought about a State recommendation for leniency, including the absence of any request for a declaration of habitual offender, there is utterly nothing to suggest that it was performed."[6] Despite our clear direction in our first Opinion, the judge failed to make any factual findings about

tense, the clause implies that the "agreement" is hypothetical or counterfactual. *E.g.* "If America were still a British colony, we would all drink tea in the afternoon." Under this interpretation, the judge has indicated that he doubts that an agreement ever existed. However, if the judge simply made a grammatical error and intended to write "if there *was* an agreement," that statement merely notes the question to be answered.

the terms of the oral "side" agreement. Instead, he focused solely on his belief that Scarborough failed to perform. The trial judge did not focus on what the parties' believed would constitute "work"—the sole measure of Scarborough's performance. While Scarborough's counsel cross-examined O'Neil in an effort to establish the terms of the agreement, the judge stated: "[t]his is probably addressed to both sides, but if the—if the issue here is assuming an agreement, was Mr. Scarborough capable of performing it and did he? If the response is that he never did anything, isn't all this kind of academic?"

Although the trial judge declined to make factual findings on the oral agreement's terms, the record discloses, and we find, that the testimony presents a substantially uncontroverted view of the agreement the State and Scarborough believed they had reached.

The witnesses testified about two agreements in which the State first offered leniency on sentencing before the September 2005 plea agreement. In the first agreement in February 2005, Scarborough offered to provide information about Louis Tolson, a major drug dealer. In exchange for this information, the prosecutor would recommend a more lenient sentence. Scarborough, apparently, provided some—but from the State's perspective, insufficient—information about Tolson.

In the second agreement, apparently from March 2005 up to June 2005, Scarborough agreed to "work" with Hake to help apprehend other major drug dealers in exchange for leniency. The State rescheduled several case reviews to allow Scarborough to "work" with Hake. However, Scarborough never performed any "work." In the meantime, police arrested Scarborough in connection with a separate robbery incident, and Scarborough went to prison.

We must note that before the September 2005 agreement Scarborough had never agreed to plead guilty—he had only agreed to perform "work." Under the two agreements described above, Scarborough's "work" would result in leniency when, and if, he eventually did plead guilty.

In September 2005, Scarborough contacted his counsel, Dean, by mail and informed her he wanted, once again, to "work." In the letter, Scarborough apparently identifies an upcoming drug transaction involving "Willie Brown, Jermaine Brown, Pierre Down, [and] Robert Harris." Hake recognized some of these names as people from Dover. According to O'Neil, Scarborough indicated that "he'll turn these people over. He can cook up 17 ounces of powder next week."

In stark contrast to the judge's skepticism about the existence of an oral agreement, the State's witnesses, O'Neil and Dean, both testified that the parties made a supplemental oral agreement in addition to Scarborough's written plea agreement.[7]

7. In order to be thorough, we set out the relevant portions of the transcript where the State's witnesses testified that Scarborough and the State made an oral agreement. DE refers to direct examination by the State; CE refers to cross-examination by Scarborough's counsel.
O'Neil's Testimony
DE: Now, Mr. O'Neil, if you could go through what happened on September 15th of 2005.
O'Neil: September 15th, we came in here, and my notes indicate I extended a written

plea offer to Sandy Dean for Maintaining, Tampering, and Resisting Arrest ... And then on that same date, September 15th, I sent an email to Sandy referenced [Hake's] cell phone number ... in which I wrote to Sandy Dean at 5:07 p.m., on September 15th: Please make sure he knows he must work otherwise he's facing [a] habitual offender petition, thank you.
DE: And is that you understanding as to what the deal was during the plea on September 15th?

There can be *no* question there *was* an oral "side" or "outside" agreement. That agreement's terms should have been the subject of the judge's fact finding on remand. No room was left for an unrelated exercise that resulted in a conclusion that there was no agreement either because it was unenforceable or because Scarborough failed to perform it.

O'Neil: Right.

DE: Now, on September 15th, and you know based upon your recollection, what is your understanding of what the deal was with Mr. Scarborough as of the time of his guilty plea on 9/15?

O'Neil: That he was going to turn over major drug dealers. In that letter he wrote he acknowledges that it says: The deal I had with Hake fell through because that letter was sent to his brother, but tell O'Neil that I have other people like Willie Brown and those people that I deal with everyday, and they want me to cook up 17 ounces of powder next week. Tell O'Neil I can make that deal up for next week ... My email to Sandy [Dean] says, Look, make sure he does work, otherwise he's facing habitual offender petition.

CE: I understand you had a rough outline from Scarborough what he thought he could do, but you turned him over to the police officer who would then become his handler in the field and direct his activities; is that a fair assessment?

O'Neil: [T]his is now after he pled and he says he'll turn these people over. He can cook up 17 ounces of powder next week. Tell Mr. O'Neil I can make that deal up for him next week. So I sent it off to Detective Hake, that letter, and I anticipated that defendant would work with Hake. Detective Hake is not going to go and have Scarborough do something that is unreasonable....

CE: But the actual concrete terms of what was expected of Mr. Scarborough would have come from Corporal Hake?

O'Neil: You can look at it that way....

CE: [I]n terms of your involvement, you did not specify orally or in writing the concrete terms of what Scarborough was supposed to do, you, individually?

O'Neil: I did not put anything—other than the notes in my file, I did not send a letter to Scarborough or his attorney.

Dean's Testimony

Scarborough's "jailhouse" letter to Dean resulted in the formalized plea agreement under which Scarborough would plead guilty, testify against his co-defendants, and agree to "work" with Hake. In return, the State agreed to a reduction in Scarborough's bail, in order to facilitate his "work." It also agreed not to seek habitual offender status. The written portion of

DE: And what was your understanding of the bargain that was reached on September 15th of 2005?

Dean: Well, he [Scarborough] agreed to call Corporal Hake regularly and ... that was to be aimed at helping the State to apprehend various drug dealers in Kent County. DE: Now would those-you mean various drug dealers or the persons mentioned in the letter? Dean: Well, specifically the people mentioned in the letter....

DE: Now in return for Mr. Scarborough's cooperation, what was the State going to do?

Dean: Well, the State would offer him leniency at sentencing....

DE: How did the habitual offender petition or lack thereof enter into the negotiations?

Dean: Well, from the beginning we knew it could be a problem if the State filed [a] habitual offender petition; that he would be subjected to possibly a severe sentence. We were interested in either avoiding the habitual offender petition, and we were interested in making his Level V sentence, if there was any Level V, as little as possible or none at all.

DE: Okay. And [O'Neil] asked you to please make sure that he [Scarborough] knows that he must work, otherwise he's facing [a] habitual offender petition. And your response on September 16th is, Done. Does that mean you both provided the cell phone and told him he needed to work in order to avoid the habitual offender petition?

Dean: Yes.

DE: And you relayed that information to Mr. Scarborough?

Dean: Yes....

DE: And told him he had to work to avoid the habitual offender petition?

Dean: Yes.

the plea agreement submitted to the judge only included Scarborough's agreement to plead guilty and to testify and the State's agreement to reduce bail. The oral "side" agreement included Scarborough's promise to "work" and the State's promise to not seek habitual offender status if he did. However, the parties never informed the judge taking the plea of the "side" agreement. The judge, of course, had no other way of knowing that any oral "side" agreement existed.

The State intentionally left ambiguous the terms of Scarborough's "work" in the agreement, because the prosecutor could not be certain what valuable information Scarborough would provide or what he could do to satisfy the police. Even though the jailhouse letter included names ("targets"), those targets did not bind the State. Instead, the prosecutor understood "work" to be a more flexible term and that Hake would determine the value of Scarborough's "work" over time based on the importance of the targets. Scarborough's counsel, Dean, on the other hand, believed that Scarborough had "made a new agreement with the State to do the things outlined in [his September 2005] letter."

When it came time for Scarborough to perform, he never did precisely what the police demanded. Therefore, under the police's unilateral interpretation of satisfactory performance, he failed to "work" as promised. Despite the State's view, this case essentially rests on Scarborough's efforts to work with Hake, and Hake's response. Initially, Hake testified that he spoke, only once, to Scarborough in June 2005. Describing that phone call, Hake stated:

> Earlier on in the conversation he was indicating that he was going to do some work for us. When I started to get into the seriousness of it with him and that we were looking for significant returns from him in regard to the drugs or wanted subjects, he kind of—his attitude kind of changed. He told me that— basically, that the State didn't have much on him with this case; that he could just get his *plea reversed.* And that's right—soon after that is when our conversation—that's when our conversation ended at that point.

On cross-examination, Hake testified:

> As the conversation proceeded and I explained to him that we were looking for some significant returns, that's when the conversation shifted and he went into the fact about—the facts that the State didn't have that much on him and that he would give us something and that's when he talked about how he could have his *decision reversed.*[8]

Hake mentioned that he and Scarborough never discussed any names, but he did tell Scarborough that he needed to perform significant "work." Hake also testified that "the only other information I received was a letter, which was passed on to me from Mr. O'Neil, which provided some names of local drug dealers." On cross-examination about those names, Hake replied "I know that they are around the Dover area...." Hake testified that because the names were Dover people, the Dover police had jurisdiction and that the Dover Police, in Hake's opinion, did not want to work with Scarborough. Hake preferred for Scarborough to infiltrate drug dealing in Woodside instead. Even so, no one ever informed Scarborough or his counsel before reaching the plea agreement, about any problem in satisfying the performance standard under the agree-

---

8. An email from Hake to O'Neil also indicates that Hake spoke with Scarborough and Scarborough suggested that "they didn't have much on him and that he could get his convictions reversed."

ment because the people he named lived in Dover.

Near the end of the hearing on remand, the State recognized that Hake's testimony contained a major inconsistency. Hake testified that he spoke to Scarborough only in June 2005 and, during that conversation, Scarborough told Hake that "he [Scarborough] could just get his plea reversed." Scarborough did not enter his plea until September 2005, however. Accordingly, the State conceded that Hake must have spoken to Scarborough in September 2005 *after* the plea agreement.

Scarborough testified that he spoke to Hake *after* he entered the plea agreement on September 15, and that during this conversation, they discussed the names in his letter but Hake rejected them because the people lived in Dover. Scarborough testified:

> I said I can't go to Woodside and mess with those people, that's dangerous to go down to Woodside and try to just move right in. [Hake] wasn't rude or anything but he let me know that's what he needed me to do, because they couldn't step on Dover. I said I'm not from Woodside, I don't know anybody in Woodside, all I know is Dover. Those are the names I put on the paper, Dover names. If I went down to Woodside and try to infiltrate them in Woodside, that was endangering my life, that's a hazard.

After this attempt to "work" fell through, Scarborough attempted to meet his end of the bargain once again. After the January 2006 sentencing hearing, where Scarborough requested to withdraw his guilty plea, Scarborough's new counsel, Dunkle, sent an email to O'Neil with a second list of names. O'Neil, Dunkle,

Hake, and Dover police discussed the offer. However, this offer also did not satisfy the State. Because this second list also included Dover area drug dealers, Dover police needed to be involved. According to O'Neil: "[n]one of the detectives assigned to Dover Police will work with [Scarborough], [including] Operation Safe Streets...."

### DISCUSSION

Our Opinion remanding this case instructed the trial judge to analyze and make fact findings on the following issues: "what the exact terms of the oral side agreement were, whether Scarborough fulfilled or could realistically have fulfilled those terms, or whether any factual issue raised by the oral side agreement resulted in Scarborough's 'misapprehension' about the effect of his guilty plea." [9]

■ Typically, we review a trial judge's findings of fact to determine if they are based on competent evidence and not clearly erroneous.[10] But, where the issue involves interpreting the terms of a plea agreement, we have previously held that, because a plea agreement is based on contract principles, we look to contract law for the appropriate standard of review.[11] Therefore, "[a] trial judge's interpretation of contract language involves questions of law that this Court reviews *de novo* for legal error. Conversely, a trial judge's ruling concerning the existence or nonexistence of an oral contract is a question of fact that we review for an abuse of discretion." [12]

### 1. Terms of the Oral Agreement

■ For reasons not disclosed by the record, the trial judge chose to regard our

9. *Scarborough,* 938 A.2d at 654.

10. *See DeJesus v. State,* 655 A.2d 1180, 1191 (Del.1995).

11. *Cole v. State,* 922 A.2d 354, 359 (Del.2005).

12. *Id.*

first question as a mere academic exercise—made evident by his comments at the hearing and in his Order. In one particularly telling phrase, the judge notes his skepticism of our directions by adding "if there ever *were* an agreement."[13] We read that statement as an indication that the judge believed the terms of the oral agreement to be utterly inconsequential. They were not.

We can understand the judge's frustration with this case. The parties intentionally kept him "out of the loop" by failing to abide by Superior Court Rule of Criminal Procedure 11(e)(2), which required the parties to disclose the terms of the oral agreement, at least, "in camera, at the time the plea is entered." That frustration cannot, however, excuse a refusal to accept the fact that an oral side agreement— however nebulous by its terms or difficult to satisfy because a third party controlled the measure of performance—existed. At the hearing on remand, the prosecutor himself testified under oath that the parties had reached a side agreement: "[I] extended a written plea offer to Sandy Dean for Maintaining, Tampering, and Resisting Arrest ... and then on that same date, September 15th, I sent an email to Sandy ... in which I wrote ... Please make sure [Scarborough] knows he must work otherwise he's facing [a] habitual offender petition, thank you." We therefore have little choice but to hold that the judge abused his discretion because he simply *never* engaged in the fact finding or analysis that we charged him to perform.

 "Plea agreements are undertaken for mutual advantage and governed by contract principles ...."[14] Under contract principles, "[e]ven when defendant and the State agree upon a plea agreement, the agreement is executory in nature and dependent on the court's approval."[15] The contract remains executory so long as "there remains something still to be done on both sides ...."[16] As every first year law student learns, one of the central tenets of contract law is that a contract must be reasonably definite in its terms to be enforceable.[17] But, a contract requiring nothing more definite than performance to one party's satisfaction is enforceable.[18] To protect the performing party from the whims of the other's satisfaction:

> Such a promise is usually considered as requiring the promisor to render performance which shall be satisfactory to the promisee, if he exercises an honest judgment. But the promisee must give fair consideration to the matter. A refusal to examine the promisor's performance, or a rejection of it not in reality based on its unsatisfactory nature but on fictitious grounds or none at all, will amount to prevention of performance of the condition and excuse it.[19]

After reviewing the relevant testimony and the parties' concessions at both oral arguments, we find the oral "side" agree-

13. *Scarborough*, 2007 WL 2319777.

14. *Cole v. State*, 922 A.2d 354, 359 (Del.2005) (internal quotes omitted); *Washington v. State*, 844 A.2d 293, 296 (Del.2004).

15. *Washington v. State*, 844 A.2d 293, 296 (Del.2004) (citing *Weatherford v. Bursey*, 429 U.S. 545, 561, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)).

16. BLACK'S LAW DICTIONARY, 344 (8th Ed., 2004).

17. *See Truitt v. Fahey*, 52 A. 339 (Del.Super.1902); *Most Worshipful Prince Hall Grand Lodge v. Hiram Grand Lodge Masonic Temple*, 32 Del.Ch. 85, 89, 80 A.2d 294 (1951).

18. *See Raisler Sprinkler Co. v. Automatic Sprinkler Co.*, 171 A. 214, 217 (Del.Super.1934); *Taylor v. Trustees of the Poor*, 43 A. 613, 614 (Del.Super.1899).

19. *Raisler*, 171 A. at 217.

ment to be enforceable and that it supplemented the written plea agreement. The plea agreement, in its entirety, was, therefore, as follows: First, Scarborough would plead guilty, testify against his co-defendants, and agree to "work" with Hake. In return, the State, in order to facilitate Scarborough's "work," would reduce his bail and would not seek habitual offender status. The imprecise term "work" allowed the State to determine whether Scarborough's performance justified its forbearance from seeking habitual offender status.

The written portion of the plea agreement submitted to the judge only included Scarborough's agreement to plead guilty, his promise to testify, and the State's agreement to reduce bail. The undisclosed oral side agreement included Scarborough's promise to "work" and the State's promise to not seek habitual offender status if he performed that "work."

### 2. Did Scarborough Perform the Oral Agreement?

■ By failing to answer our first question, the judge's analysis of the second question, i.e. whether Scarborough fulfilled or could have fulfilled the agreement, was inherently flawed. It is logically impossible to determine whether Scarborough performed the oral agreement without first knowing the terms of the oral agreement. By failing to determine the oral agreement's terms, the judge's analysis of whether Scarborough performed the oral agreement can only be described as unhelpful.

In his Order, the judge determined that the issue of whether Scarborough's compliance was "intrinsically unfulfillable [sic] ... can relate only to the 'delivery' of Jeff Tolson or the later mentioned individuals." [20] The judge's focus on Scarbor-

ough's failure to produce Tolson is entirely misplaced, however. The agreement to provide information about Tolson was made in February 2005, seven months before the plea agreement. That route was exhausted well before the parties ever contemplated the September plea agreement. The February agreement relating to Tolson merely provides the historical backdrop to the parties' dealings. Scarborough's failure to provide sufficient information about Tolson in no way implicates the September plea agreement or the alleged impossibility of performing it. In basing his findings about Scarborough's performance on matters completely unrelated to the relevant oral agreement, the judge abused his discretion.

The testimony at the hearing on remand demonstrates, and we find that Scarborough attempted to provide information about the individuals listed in his September 2005 letter. The uncontroverted testimony established that Scarborough offered a list of targets, the State and Scarborough then entered into the plea agreement, and thereafter the State balked at Scarborough's offer because the targets were located in Dover.

O'Neil's, Dean's, and Hake's testimony established that Scarborough's September letter, with a list of names, prompted the plea agreement. At some point, Hake saw this list and recognized a few of the names falling in the Dover police's jurisdiction, but neither he nor O'Neil voiced any dissatisfaction, before Scarborough pleaded, about the names because the names were Dover targets. Nevertheless, the State and Scarborough agreed that Scarborough would "work." Scarborough and his counsel reasonably believed the (Dover) targets listed in his letter would form the basis of his "work." But, when Scarborough contacted Hake to fulfill his obligations, Hake

---

**20.** *Scarborough,* 2007 WL 2319777 at *2.

informed Scarborough that Scarborough needed to "work" in Woodside because the targets that Scarborough suggested all lived in Dover, outside of Hake's jurisdiction. Scarborough objected to working in Woodside because he believed that it would be unnecessarily dangerous. After Hake threatened to play his trump card and seek habitual offender status, Scarborough retorted that he would simply withdraw his guilty plea. After that exchange, neither Hake nor Scarborough attempted to "work" together.

### 3. *Is Scarborough's Performance Excused?*

Because this plea agreement provided the State with the ability to decide Scarborough's performance, we reiterate the State's duties. The State must exercise "honest judgment" and give "fair consideration" to determine whether Scarborough's "work" was sufficient.[21] If we find that the State acted in bad faith or failed to give Scarborough's offer fair consideration, his performance is excused.[22] As we explained in *Cole*, Scarborough had a legitimate expectation that the State would "refrain from arbitrary or unreasonable conduct which has the effect of preventing [Scarborough] from receiving the fruits of the bargain." [23]

At its most basic level, "work" is a customary code word to describe a generic defendant's proposed cooperation with police. On facts less fleshed out than in this case, it may be nothing more than an attempt, for public policy reasons to "use a thief to catch a thief." Ergo, *Superior Court R. 11(e)(2).* That Rule is designed to involve the judge fully at the time the plea is entered. A judge can help strike a

reasonable, comprehensible performance measure by helping to craft a factual predicate for "satisfactory work." The use of the nebulous term "work," the practice of allowing the police, post-agreement unilaterally to define the measure of performance of that "work," and the failure to involve the judge at the time of the plea, are what doomed the satisfactory performance of this agreement. From the State's perspective, Scarborough never performed any "work" because Hake would not investigate the targets that Scarborough suggested. Yet, from Scarborough's view, "work" meant gathering evidence on the individuals that he identified in his September letter that precipitated the discussions. He viewed the State's attempt to convince him to "work" in an area unknown to him as inherently "unworkable" and inconsistent with his view of the fair measure of his performance. We understand that the State wished to reserve judgment before fully committing to forbear from seeking habitual offender status. Nonetheless, the State was required to exercise that judgment in good faith. At the time the parties entered into the plea agreement, Scarborough must have believed that gathering evidence against the people named in the letter would. satisfy his end of the bargain, because the letter was the catalyst that led to the plea agreement.

After reviewing the testimony, we believe the position advanced by Dean, Scarborough's then-counsel, who testified on behalf of the State at the hearing on remand, must prevail. Dean testified that she believed that the September 2005 letter established a framework for Scarborough's "work." During the negotiations, Scarborough had already identified several

---

**21.** *Raisler,* 171 A. at 217.

**22.** *See Id.* (holding promisee's failure to give due consideration relieved promisor's duty to perform).

**23.** 922 A.2d at 359.

names in the letter. If, at the time of the agreement, the State believed the targets to be "unworkable," the State had a good faith duty before finalizing the plea agreement to so inform Scarborough's counsel. The State cannot validly enter into a plea agreement knowing the defendant harbors a mistaken belief about its terms.

The testimony establishes that the State knew or should have known, before it made the plea agreement, that the police to whom they would refer the "work" would find Scarborough's names to have little or no value. O'Neil testified that after he received Scarborough's jailhouse letter, he would have immediately sent the list of names to Hake. Hake testified that he recognized some of the names on the list as Dover people. Nearly two weeks passed before Scarborough and the State entered into the plea agreement. That would have afforded O'Neil sufficient time to inquire about the listed names and would have provided Hake ample time to voice his objections, if, in good faith he had any, to O'Neil.[24] Therefore, by the time the parties made the agreement, O'Neil knew or should have known that "working" Scarborough's suggested names would not satisfy the State's measure of satisfactory performance.

Because the State never intended to pursue Scarborough's names, the State was required to tell Scarborough and his counsel that *before* he agreed to plead guilty. By withholding this critical information, the State left Dean and Scarborough with the reasonable expectation, at the time of the agreement, that "working"

some or all of the names in the September letter would satisfy the performance standard encompassed by the term "work."

When Scarborough attempted to perform, he called Hake who simply dismissed all of Scarborough's names out of hand. Hake had a duty to "refrain from arbitrary or unreasonable conduct which has the effect of preventing [Scarborough] from receiving the fruits of the bargain."[25] Because Scarborough had a reasonable expectation that the names he offered would form the basis of his "work," Hake's objection and demand that Scarborough instead "work" in Woodside were unreasonable. Therefore, Hake's refusal to accept Scarborough's offer to "work" the Dover people at this point caused the State to breach the plea agreement and excused Scarborough from performance.

### 4. *The Appropriate Remedy*

■ Given Scarborough's excused performance, we reach the final issue: what is the appropriate remedy? Because the plea agreement is based on contract principles, a remedy for the violation or breach of the plea agreement should mirror contract remedies while still protecting the defendant's due process rights.[26] The dissent in our *Cole* opinion, and other courts, have recognized that when the State breaches a plea agreement generally two alternative remedies exist: (1) the defendant may withdraw his guilty plea, or (2) the sentencing judge may specifically enforce the agreement and correct the defendant's sentence in accord with the plea agreement.[27]

---

**24.** We recognize that O'Neil and Hake may not have fully exchanged information. However, in this situation, we must impute Hake's knowledge to O'Neil. O'Neil had an inquiry duty to learn the value of Scarborough's proffered names before he entered into the plea agreement with Scarborough. It would be unjust here to fault Scarborough for a break-

down in communication between O'Neil and Hake.

**25.** *Id.*

**26.** *See U.S. v. Olesen*, 920 F.2d 538, 541–42 (8th Cir.1990).

**27.** *See* 922 A.2d at 377; *See, e.g., id.; U.S. v. VanDam*, 493 F.3d 1194, 1206 (10th Cir.

Withdrawal of the guilty plea is equivalent to a rescission of the plea agreement. That remedy restores the parties to their position before they reached the plea agreement. The alternative would be to provide Scarborough the (unrealized) benefit he bargained for in the plea agreement—*i.e.* the State's promise not to apply for habitual offender status. Although Scarborough moved to withdraw his guilty plea, the decision is not his to make. It is for us to ultimately determine and craft the appropriate remedy.[28]

In deciding the appropriate remedy, we note that the State could have performed its end of the bargain.[29] The remedy options would be completely different had the prosecutor acted in bad faith and promised to do something outside of his power. In that case, we could not specifically enforce the agreement, and rescission would be necessary. Moreover, as the Tenth Circuit recognized in *VanDam*, allowing the defendant to withdraw his guilty plea should be reserved for instances of grave prosecutorial misconduct.[30]

Here, the prosecutor omitted information that was critical to measuring performance and failed to advise Scarborough of that information when he entered into the plea agreement. But, the prosecutor did not engage in misconduct—*e.g.* a knowingly false promise that induced Scarborough's guilty plea. It is within the State's power to withhold petitioning for habitual offender status. In these circumstances, we conclude that the appropriate remedy is to enforce specifically the State's promise and deny the State's petition to declare Scarborough a habitual offender. Therefore, we vacate Scarborough's sentence and remand this case for sentencing consistent with this opinion, and affirm the denial of Scarborough's motion to withdraw his guilty plea.

### 5. The Requirements of Rule 11(e)(2)

Although we do not characterize counsels' actions as "misconduct," we must address the State's and defense counsel's failure to inform the judge about the oral "side" agreement. That failure has triggered time consuming, expensive and unnecessary delays in resolving a guilty plea entered into in 2005. *Superior Court Rule 11(e)(2)* prescribes:

> If a plea agreement has been reached by the parties, the court shall, on the record, require the disclosure of the agreement in open court or, on a showing of good cause, in camera, at the time the plea is entered.

This requirement was not observed. After Scarborough acknowledged to the judge that he understood that the written plea agreement contained his entire agreement with the State, both the prosecutor and defense counsel, in the face of their obligation under the Rule, sat mute. The blame for these dysfunctional proceedings does not lie with the judge but with counsel.

We recognize the practical reasons why an oral agreement such as the one reached here cannot be read in open court. We acknowledge that practical benefits can flow from making deals for "deals" in com-

2007); *U.S. v. Brye,* 146 F.3d 1207, 1213 (10th Cir.1998); *U.S. v. Camper,* 66 F.3d 229, 232 (9th Cir.1995); *State v. Parker,* 334 Md. 576, 640 A.2d 1104, 1118 (1994).

**28.** *See VanDam,* 493 F.3d at 1206.

**29.** *See Parker,* 640 A.2d at 1118 (allowing defendant to withdraw guilty plea where the

State prosecutor promised incarceration in a federal institution, which exceeded the scope of his authority); *U.S. v. Hammerman,* 528 F.2d 326, 332 (1975) (holding prosecutor lacked power to assure defendant that court would accept recommendation for sentence; proper remedy is to withdraw guilty plea).

**30.** 493 F.3d at 1206.

bating drug trafficking. Scarborough's co-operation with the police would be wholly thwarted had the agreement been divulged in open court. However, *Rule 11(e)(2)* leaves the prosecutor, defense counsel, and the judge with a sensible and viable alternative—disclosure *in camera.*

We have previously recognized the policy reasons for memorializing agreements between the State and defense in criminal matters.

> To the extent possible, all agreements of this type should be in writing or placed on the record in open court or chambers. Documenting agreements or 'deals' in this way will greatly reduce the potential for after the event confusion. More importantly, by spending the limited time necessary to reduce an agreement to writing, parties can obviate the need to hold a hearing to determine whether an agreement exists and its terms, thereby saving several days of the courts' and the parties' time.[31]

■ Both the State and defendants benefit from disclosing all the terms of plea agreements. A judge, with a full understanding of the agreement between the parties at the outset, can continually, upon request, assess whether one party's conduct violates the plea agreement's terms and attempt to cure any deficiency by requiring its immediate performance. But, when the parties wait—as in this case—until the entire agreement unravels, a judge will find his options severely curtailed.

Moreover, where the parties fully inform the judge about the agreement at the time the plea is taken, the judge will be able to identify areas of potential ambiguity and require the parties to address them *ex ante.* In this case, for example the judge may have required the State and Scarborough to hammer-out a framework for as-sessing whether Scarborough's "work" would be satisfactory and may have addressed whether Scarborough's offered names would satisfy the "work" performance standard. On these facts, at least, there is every reason to believe that the Dover/Woodside, State Police/Dover Police dichotomy would have been fleshed out early on.

Second, we must also comment on the definiteness of the terms in the parties' agreement. How could the parties have defined the term "work" in their agreement? How can the State and a defendant respond to a judge inquiring about actions satisfying such a nebulous measure of performance?

We appreciate the State's dilemma where the defendant offers a list of targets that he is willing to contact. The prosecutor negotiating the deal will normally not know the significance of the names being offered by the defendant. Without knowing the value of the defendant's information, the prosecutor cannot possibly be expected to promise a specific sentence recommendation. Therefore, the prosecutor has an incentive to fashion a deal using imprecise terms. Yet, common sense dictates that when a defendant supplies names of targets before pleading, he will believe the names he provided will form a satisfactory basis for his "work." Thus, the prosecutor must advise a defendant, who has already suggested some targets, that the proffered names may not satisfy the State or may delay the plea until the parties have crafted a "workable" performance standard—more than likely after police input.

More generally, prosecutors should fashion standards of performance that are more precise than simply "work." For example, a more useful agreement might

---

**31.** *Cole,* 922 A.2d at 373.

have indicated the number of "buys" expected, if any, specifying the location (perhaps "Kent County, excluding Dover"), and a timeframe for performance. With more precise terms of this kind, the State will not be able to pick and choose its targets by names, geography, or numbers. By the same token, the defendant will have no room to complain about where he "works" or what is expected of him. An agreed to time table also enables the State to proceed with sentencing if the defendant unreasonably stalls and never completes a measurable performance standard for "work."

We believe this approach would be prudent and feasible. Occasions may arise where a trial judge may need to stray from this formulation depending on the circumstances of the case. In this case, however, the terms known to the parties before Scarborough pleaded, if fully disclosed to the judge, would have obviated the critical flaw in the unnecessarily convoluted scenario that occurred here.

## CONCLUSION

The judgment of the Superior Court is **AFFIRMED,** in part, **VACATED,** in part, and **REMANDED** for action consistent with this Opinion. Jurisdiction is not retained.