IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE        :   Def. ID#s 1501012420

                                                      1506013665

v.                           :             1507007288

                                                      1507017419

MICHAEL D. COVERDALE,       :

         Defendant.             :


MEMORANDUM OPINION ON DEFENDANT'S

MOTION FOR POSTCONVICTION RELIEF

MOTION GRANTED


DATED SUBMITTED: March 17, 2017

DATE DECIDED: April 18, 2017

Tasha Marie Stevens, Esquire and Melissa S. Lofland, Esquire, P.O. Box 250, Georgetown, DE 19947 and Thomas D. Donovan, Esquire, Kent County Courthouse, 38 The Green, Suite 259, Dover, DE 19901, counsel for Defendant.


Rebecca E. Anderson, Esquire, 114 E. Market Street, Georgetown, DE 19947, on behalf of the State of Delaware.

STOKES, J.

Michael D. Coverdale ("defendant" or "Coverdale") has filed a motion for postconviction relief pursuant to Superior Court Criminal Rule 61 ("Rule 61") wherein he seeks to vacate a portion of his guilty plea on the ground it was not knowingly, voluntarily or intelligently entered. He bases his claim for relief upon the fact that the State of Delaware ("the State") misrepresented that it did not have any *Brady*[1] materials regarding the chemist who tested the drugs in one of his cases before he entered the plea, a misrepresentation upon which he and his counsel relied when entering the guilty plea. This is my decision on the pending motion.

Four sets of charges were pending against defendant at the time he entered his guilty plea on February 19, 2016:

**1) Def. ID# 1501012420**: This case consisted of 9 counts.[2] Defendant pled guilty to 2 counts: drug dealing of heroin Tier 4 and possession of a firearm by a person prohibited.

**2) Def. ID# 1506013665**: This case consisted of 3 counts of drug dealing plus an aggravator. All charges were nolle prossed as a result of the plea.

---

[1]*Brady v. Maryland*, 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("*Brady*"). As explained in *State v. Reyes*, 2017 WL 243360, *16 (Del. Jan. 19, 2017):

> A defendant seeking to establish a *Brady* violation must show (1) that the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching, (2) that the evidence must have been suppressed by the State, either willfully or inadvertently, and (3) prejudice must have ensued.

[2]Defendant was indicted on the following charges: drug dealing of heroin Tier 4; aggravated possession of heroin Tier 5; possession of a firearm by a person prohibited; possession of ammunition by a person prohibited; possession of marijuana; illegal possession of oxycodone; and 3 counts of possession of drug paraphernalia.

1

**3) Defendant ID# 1507007288**: This case consisted of 3 counts.[3] Defendant pled guilty to 1 count of drug dealing Tier 2 (a lesser of drug dealing Tier 4) and the other two counts were nolle prossed.

**4) Defendant ID# 1507017419**: This case consisted of 1 count of drug dealing plus an aggravator. This charge was nolle prossed as a part of the plea.

Defendant had one set of attorneys for the case of *State v. Coverdale,* Def. ID# 1501012420 and another attorney for the cases of *State v. Coverdale,* Def. ID#s 1506013665, 1507007288, and 1507017419. The same Deputy Attorney General appeared on behalf of the State of Delaware ("the State") in these cases as well as in the linked case of *State of Delaware v. Randolph Clayton,* Def. ID# 1506019597 ("*Clayton*").

## FACTS

On February 20, 2015, defense counsel filed a request for *Brady* material.[4]

Bipin Mody ("Mody"), an employee of the Division of Forensic Science ("DFS"), was the chemist who tested the drugs in Def. ID# 1501012420. He was not the chemist who tested the drugs in the other three cases.

Throughout 2015, DFS chastised Mody for poor work habits which called into question chain of custody, appropriate testing procedures, the correct identification of drugs, and his credibility. The following problems with his work were documented: Mody's work was constantly being returned to him for more editing; Mody did not always rerun drug samples after

---

[3]These charges were aggravated possession of heroin Tier 5; drug dealing Tier 4; and possession of drug paraphernalia.

[4]*Coverdale,* Docket Entry 4 (hereinafter, "*Coverdale,* D.E. ___"). Another attorney represented defendant at this time.

2

being told to do so; some cases had to be retested because Mody was not following the proper testing procedures; Mody did not always list all of the defendants on documents for suspected drug samples that he was testing; Mody was not always candid when confronted about his errors and omissions; Mody was not able to keep up with his workload, resulting in considerable pressure being brought on him by his supervisors to keep up; Mody did not always follow the procedures prohibiting multiple drug lockers from being opened simultaneously; Mody sometimes entered incorrect lot numbers for reagents; Mody did not always put the correct locks on the correct lockers; cases were returned to Mody because he had not entered the correct information into his reports; Mody did not follow the proper procedures when doing his proficiency tests; Mody left evidence unattended on his bench in the laboratory.[5]

On January 20, 2016, the State informed Mody that it was going to dismiss him for his systematic failure to follow laboratory policies and procedures in reference to his testing of suspected drug samples and reporting his findings to the Department of Justice in a timely manner.[6] On February 3, 2016, Mody resigned rather than be terminated.

The final case review scheduled in Coverdale's case for February 17, 2016, was continued at defendant's request until February 19, 2016.

On February 17, 2016, the State sent a letter to defendant's counsel notifying them that Mody had resigned from his employment.[7] Defense counsel received the letter on February 18,

---

[5]*Clayton*, Docket Entry 65 (hereinafter, "*Clayton*, D.E. __").

[6]*Id.*

[7]*Coverdale*, D.E. 62.

3

2016. The State sent defense counsel in *Clayton* a similar letter, also dated February 17, 2016.[8]

Final case review in defendant's case took place on February 19, 2016. On this date, the final business day before trial, the State owed to defendant all of the *Brady* material it had because defendant had requested the production of that information early in the litigation.[9]

The transcript of this proceeding shows that at case review, the State, well-aware it owed any *Brady* material it had to the defense, misrepresented it did not have any *Brady* material regarding Mody.

> [DEFENSE COUNSEL]: ... [Y]esterday we received some information that has substantially effected [sic] our, I guess our duties as counsel, as well as our client's ability to make a decision as far as this case.
> My co-counsel and I have been reviewing some issues with the lab reports and the drug evidence, and looking over that quite a bit because trial was approaching, and then yesterday we received a letter from the AG's office that the chemist, who had done all of the testing in our case, resigned. So we had no information as to why, what happened prior, if there was suspension, if there was misconduct or anything. So that was actually clocked in around 3:11 yesterday and we received it at about 4:00 yesterday. So very, very little time to look into what happened.
> **So today we were advised by the State that it was simply that the chemist was lazy but they believe that he would still be available.**
>
> THE COURT:[10] For trial next week?
>
> [DEFENSE COUNSEL]: For trial, which is supposed to start on Monday. However, that quantum of information doesn't really satisfy. I think our duty as

---

[8]*Clayton*, D.E. 48.

[9]Super. Ct. Crim. R. 16. Additionally, Sussex County's Case Management Plan provides:

> Automatic discovery and Rule 16 discovery needs to be exchanged before case review so that case review will be meaningful. Defense counsel must have the opportunity to digest the discovery materials before entering into plea negotiations. The State is expected to provide discovery at least one week prior to the case review.

[10]The Judge presiding over this case review proceeding was not this Judge.

4

practitioners to our client just to say he's lazy, if he's lazy, how did that affect his testing of the alleged drugs in this case.

THE COURT: **So he was fired and the reason he was fired had, according to the State, had nothing to do with his misconduct. He was allowed to resign. But why he was allowed to resign had nothing do with misconduct but simply his productivity?**

[PROSECUTOR]: **That is correct, Your Honor.**

[DEFENSE COUNSEL]: That's what we have been advised at this point. There's nothing to support that and I would request that information. ***

THE COURT: What more would you want her to provide you? His personnel file might not be very open to the public.

[DEFENSE COUNSEL]: Not the entire file but what led to this series of events. **My understanding was that he was actually suspended pending discipline up to termination. If that's the case, what brought this forth? Was it he said he tested – he's lazy and he said he tested 20 bags but he tested six and he didn't test the rest type deal. I think it affects the integrity of the information that substantially affects this case.**

***

[PROSECUTOR]: Your Honor, the chemist in question is Bipin Modi [sic]. He was placed on administrative leave on January 20th and decided to resign on February 3rd. **The only issue is his turnaround time on case work. There's absolutely no evidence or indication, anything Brady material, and no indication that he was doing anything illegal, tested positive for any illegal substance, no indication that he was dry-labbing or not testing items. It was simply his turnaround time on case work. We disclosed on all pending Bipin Modi [sic] cases out of an abundance of caution. There is no Brady information that the State is aware of.**
**The State is of the position that we didn't even have to disclose this information. It's no different from a police officer retiring or resigning or someone working at SUSCOM deciding to retire or resign. The only reason this is being blown out of proportion is because of the prior OCME issues. Mr. Modi [sic], there's absolutely no indication that he was involved in anything illegal. We just disclosed out of an abundance of caution.** (Emphasis added).[11]

_____

[11]Transcript of 2/19/16 Proceedings in *Coverdale* at 2-6 (D.E. 63).

Defense counsel requested a continuance because of this recent disclosure. Rather than grant a continuance, the Court ruled it would allow defense counsel to talk to Mody on Monday, February 22, 2016, the day trial was scheduled to begin, and then trial would commence the next day. The Court did not order the production of Mody's personnel file.

The transcript shows the following additional exchange that day:

> [PROSECUTOR]: Your Honor, I did check with Wilmington and the only issue is his turnaround time on case work. There's nothing else.[12]

The prosecutor adamantly stated, several times, that there was no *Brady* material on Mody when, in fact, substantial and serious impeachment material existed regarding Mody.[13] The Wilmington Deputy Attorney General's detailed knowledge about why Mody was leaving his job is imputed to the prosecutor in Sussex County on February 19, 2016.[14] Because that knowledge is imputed, there is no need to hold a hearing to determine: 1) whether the prosecutor did not have all the information regarding Mody and was merely relying on the Wilmington Deputy Attorney General's statement that Mody's only issue was his laziness; 2) whether the prosecutor did not understand what constitutes *Brady* material and that the information regarding Mody was *Brady* material; or 3) whether the prosecutor, with an awareness of all of the materials and an understanding that *Brady* required production of them, consciously hid this information. Thus, the prosecutor in Coverdale's case is imputed with the knowledge that Mody's work was constantly being returned to him for more editing; Mody did not always rerun drug samples after

---

[12]*Id.* at 7.

[13]There is nothing at this point showing any exculpatory information existed.

[14]*Wright v. State*, 91 A.3d 972, 992 (Del. 2014).

being told to do so; some cases had to be retested because Mody was not following the proper testing procedures; Mody did not always list all of the defendants on documents for suspected drug samples that he was testing; Mody was not always candid when confronted about his errors and omissions; Mody was not able to keep up with his workload, resulting in considerable pressure being brought on him by his supervisors to keep up; Mody did not always follow the procedures prohibiting multiple drug lockers from being opened simultaneously; Mody sometimes entered incorrect lot numbers for reagents; Mody did not always put the correct locks on the correct lockers; cases were returned to Mody because he had not entered the correct information into his reports; Mody did not follow the proper procedures when doing his proficiency tests; and Mody left evidence unattended on his bench in the laboratory.

On February 19, 2016, the prosecutor knew that the *Brady* materials on Mody were significant to defendant, who was facing a trial where an undisputed identification of drugs and an undisputed linking of those drugs to defendant were essential elements of the State's case against him. The defense could have used this information to impeach Mody with regards to his testing procedures, his identification of the drugs in defendant's case, the chain of custody, and Mody's credibility. The State's characterizations of the nature of the materials it had on Mody were substantial misrepresentations and the State affirmatively concealed this *Brady* material.

A review of the transcript of the February 19, 2016 case review establishes that defense counsel relied on the State's representation that there was no *Brady* material of which the State was aware regarding Mody and that defense counsel relied on the misrepresentation in advising Coverdale to accept the plea, which would expire at 4:30 p.m. that afternoon. I find that the material misrepresentations and concealment of the *Brady* materials induced defense counsel to

7

entertain a plea and the misrepresentations and concealment induced defendant to enter the plea. Stated another way, had the prosecutor been forthcoming and truthful that *Brady* material on Mody existed, trial counsel would not have encouraged defendant to enter the plea and defendant would not have entered the plea he entered that day.

However, defendant, in ignorance of the true material facts, did enter into the plea.[15] Nothing about Mody was mentioned during the plea colloquy. The plea colloquy was thorough and complete and defendant admitted the crimes charged. Defendant was sentenced that day.

The State's misrepresentation of the information about Mody was exposed in the *Clayton* proceedings. Between the end of March, 2016 and August, 2016, several court proceedings took place in *Clayton* where the topic was the nature of the information the State had on Mody.

When Clayton's trial counsel learned of Mody's resignation, he sent a letter requesting Mody's personnel file and he also sent a subpoena seeking that personnel file. The prosecutor explained that she reviewed the file as did a Deputy Attorney General in Wilmington. Neither considered there to be any *Brady* material in the file. The Court disagreed, ruling that it was not a close case at all, that Mody was leaving the State's employment because of his systematic failure to follow the laboratory policies and procedures in reference to testing suspect drug samples and reporting his findings to the Department of Justice in a timely manner.[16] The Court ruled that the *Brady* materials pertaining to Mody were to be released to defense counsel, it required the State to provide this information to all defense counsel and *pro se* defendants in 2015-2016 cases

---

[15]*Coverdale,* D.E. 69. This Judge took this plea. This Judge was not aware of the previous issues concerning Mody.

[16]Transcript of 3/31/16 Proceedings in *Clayton.*

8

where Mody was the chemist, and specifically, the Court required that a packet of information be sent to Coverdale's attorney.[17] The State filed a motion to reargue, requesting the Court allow Mody's supervisors to testify to show that the documents were not *Brady* materials. The Court denied the motion to reargue and ordered, again, that the State provide the *Brady* information on Mody.[18] Ultimately, the Court did not dismiss the case due to a violation of *Brady*, ruling there was no prejudice because defendant Clayton received the *Brady* information substantially before trial. In the end, the Court did not address the issue of prosecutorial misconduct despite defense counsel's requests that it do so.

The State thereafter filed a nolle prosse of all the drug charges against the defendant in the *Clayton* case.

In a letter dated July 21, 2016, the State informed Coverdale's counsel of the Court's ruling in the *Clayton* case regarding Mody.[19]

In emails dated August 10 and August 17, 2016, the State informed Coverdale's defense counsel that the State did not intend to take any further action in Coverdale's case despite the information sent on July 21, 2016; i.e, it would not be dropping the drug charges against Coverdale.[20]

On October 7, 2016, defendant filed his motion for postconviction relief.

---

[17]Transcript of 4/6/16 Proceedings in *Clayton,* D.E. 85.

[18]Transcript of 6/30/16 Proceedings in *Clayton,* D.E. 81.

[19]*Coverdale*, D.E. 65.

[20]Attachment to Defendant's Motion for Post-Conviction Relief (D.E. 66).

9

## DISCUSSION

In the usual case, the Court looks at the procedural bars before considering the merits. However, in this case, the findings and legal conclusions the Court makes on the merits are integral to its findings on the applicability of the procedural bars. Thus, I first delve into the merits and then review the procedural bars.

The focus of this Court's decision is on determining what constitutes an intelligent plea and what is the consequence of a prosecutor misrepresenting a substantial factor upon which the defendant relied in entering the plea. The focus on the plea itself which was induced by the State's substantial misrepresentation is framed within the larger principle of justice: what is fair and appropriate in a plea bargaining situation.

The defendant argues that the materials were discoverable under *Brady* and *Giglio*.[21] These principles are explained in *Michael v. State*:[22]

> The United States Supreme Court has long held that the prosecution's failure to disclose evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* rule was not designed to displace the adversary system as the primary means by which truth is uncovered but was designed to insure that a miscarriage of justice does not occur. The prosecutor is not required to deliver his entire file to defense counsel but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The *Brady* rule is based on the requirement of due process. *Id.* \*\*\*
> \*\*\*
> \*\*\* Evidence which the defense can use to impeach a prosecution witness by showing bias or interest, as well as exculpatory evidence, falls within the *Brady* rule (footnote omitted). *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31

---

[21]405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

[22]529 A.2d 752, 755-56 (Del. 1987).

L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an accused" so that, if disclosed and used effectively, it might make the difference between conviction and acquittal (citation omitted).

Defendant argues the prosecutor's "actions and omissions violate the tenets of *Brady* and *Giglio* in that [sic] file included exculpatory[23] and impeaching information and evidence that was material to the guilt or innocence of Coverdale, and the State's violations must be rectified whether or not the failure to disclose was negligent or intentional."[24] Defendant also argues that the prosecutor's actions "violate Professional Rule of Conduct 3.3(1), which provides that a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer, and Rule 3.8(d)(1), which requires a prosecutor to make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused."[25]

The State makes several arguments in response.

First, it asserts that the defense knew there were problems with Mody and defense counsel should have taken the opportunity to interview him on the Monday before trial rather than go forward with a plea. Viewed another way, the State's argument is that the defense should not have relied on the prosecutor's repeated and adamant representations that there was no *Brady* material on Mody and defendant is barred from seeking to remedy an injustice because defense counsel and defendant trusted the State's misrepresentations and entered the plea.

---

[23]The defense does not identify any exculpatory evidence. As noted earlier, the Court concludes the *Brady* materials here are impeachment evidence only.

[24]Defendant's Motion for Post-Conviction Relief at 6, ¶ 17.

[25]*Id.* at 6-7, ¶18.

11

The State also argues that a defendant is not entitled to receive impeachment evidence before deciding to plead guilty and defendant's voluntary guilty plea waived any right he had to the evidence. There is no constitutional violation unless defendant had gone to trial. The State cites to the Superior Court's decisions in *Binaird,*[26] as authority for concluding that the defendant's plea was voluntary and should not be revisited.

Finally, the State argues it complied with the Professional Rules of Conduct when it sent defense counsel the July 21, 2016 letter mandated by the Court in the *Clayton* case.

Defendant counters that the State concealed the information and did not bargain in good faith and with fair dealing. Defendant maintains that the State's delay in disclosing Mody's resignation (on the eve of trial, nearly a month after Mody was told he was to be terminated, and several weeks after he turned in his resignation) is relevant to concluding that the State negotiated the plea in bad faith. Defendant argues: "What occurred here was concealment and breach of duty, and Michael Coverdale's decision to take a plea does not relieve or excuse the State from its decision to avoid its constitutional obligations to disclose the information."[27]

In general, and for valid reasons, guilty pleas rarely are vacated. In particular, the Delaware courts have not allowed a defendant to withdraw a guilty plea where, after the plea, he or she later learns that problems existed within the Medical Examiner's office which information, had the defendant known about before entering the plea, would have impacted the

---

[26]2016 WL 358990 (Del. Super. Jan. 22, 2016), *rearg. den.*, 2016 WL 1735504 (Del. Super. April 26, 2016), *aff'd*, 2017 WL 443699 (Del. Jan. 18, 2017).

[27]Defendant's Reply to State's Opposition to Motion for Post-Conviction Relief at 3 (D.E. 71).

defendant's decision on whether to enter the plea.[28] These cases have held that impeachment evidence does not have a bearing on whether the plea was made knowingly, intelligently, and voluntarily.

The State argues that the decision in *Binaird* is controlling. In *Binaird*, the defendant was aware of problems with the chemist who handled his case and he entered a plea of guilty knowing of those problems. He sought to withdraw the plea after learning about other problems the chemist had with other cases. The Court did not allow him to withdraw his plea. The State argues that the defense's knowledge that Mody left his employment because he was lazy renders *Binaird* precedent in this case.

It does not. *Binaird* is distinguishable as are all of the previously-referenced Medical Examiner cases. In not one of those cases did the prosecutor make an affirmative misrepresentation before the entry of the plea that there was nothing to show that the chemist involved was subject to disciplinary actions because he or she did not follow correct testing procedures; undertook multiple practices which, in a variety of ways, undermined the chain of custody; and/or was untruthful with regard to his or her testing procedures. In none of those cases was there affirmative prosecutorial misrepresentation which caused the defendant to enter the plea under a misapprehension or mistake as to his legal rights.

In fact, in *Aricidiacono,* the Supreme Court emphasized that there was no evidence the State was aware of any problems with the Medical Examiner's office at the time the defendants

---

[28]*Aricidiacono v. State*, 125 A.3d 677 (Del. 2015) ("*Aricidiacono*"); *Brewer v. State*, 119 A.3d 42, 2015 WL 4606541 (Del. July 30, 2015) (TABLE); *Brown v. State*, 108 A.3d 1201 (Del. 2015); *State v. Binaird, supra*; *State v. Allen*, 2016 WL 520716 (Del. Super. Feb. 3, 2016), *aff'd*, 140 A.3d 1142, 2016 WL 3537565 (Del. May 24, 2016) (TABLE); *State v. Brinkley*, 2015 WL 867097 (Del. Super. Feb. 6, 2015).

13

entered their pleas.[29] The Supreme Court noted that pursuant to *Brady v. United States*, 397 US 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), "a guilty plea is considered involuntary if it is 'induced by threats..., mispresentation (including unfulfilled or unfillable promises) ....'"[30] The Court then states:

> Tellingly, the defendants do not in any way argue that the State knew about the problems at the OCME when they pled guilty and failed to disclose those problems; that the State engaged in any coercive or improper behavior to procure their pleas; or that any of the defendants in fact gave a false admission.[31]

The Supreme Court also referenced and distinguished the case of *Ferrara v. United States*[32] in *Aricidiacono*.[33] In *Ferrara*, the defendant entered into a guilty plea. Thereafter, he learned that the prosecutor had failed to disclose to him important impeachment and exculpatory evidence before he entered the plea. The Court explained that in order to set aside the plea:

> First, he must show that some egregiously impermissible conduct (say threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea. ... Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice. *See Brady v. United States*, 397 U.S. at 755....[34]

The *Ferrara* Court stated that the behavior must be particularly pernicious so as to invoke due process concerns. One of those circumstances may be where the prosecutor's failure to

---

[29] *Aricidiacono,* 125 A.3d at 679.

[30] *Id.*

[31] *Id.*

[32] 456 F.3d 278 (1st Cir. 2006) ("*Ferrara*").

[33] *Aricidiacono,* 125 A.3d at 680 n. 24.

[34] *Ferrara,* 456 F.3d at 290.

14

disclose evidence is so outrageous as to challenge the validity of the plea. In the case before it, the prosecutor manipulated a witness into reverting back to his original version of events, then represented to the court and the defense that the witness was going to confirm this manipulated version of a story that the defendant was responsible for a killing. The *Ferrara* Court found this was a rare egregious circumstance to satisfy the misconduct prong of the involuntariness test. The information was both impeaching and exculpatory. The failure to disclose was a conscious attempt to conceal the information. Furthermore, the prosecutor made affirmative misrepresentations to defendant. The outrageous misconduct constituted impermissible prosecutorial misconduct which rendered the guilty plea involuntary.

As to the prejudice aspect, the *Ferrara* Court examined whether the defendant would have entered the plea if he had this evidence, and concluded that he would not have. The Court, in reaching this conclusion, noted that "the nondisclosure of powerful impeachment evidence is apt to skew the decisionmaking of a defendant who is pondering whether to accept a plea agreement."[35]

An application of the pertinent Delaware law leads to this Court reaching the same conclusion as did the *Ferrara* Court. Delaware's law tracks the applicable law in *Ferrara* and the facts are extremely similar.

Contract principles apply to a plea agreement.[36] There is an implied duty of good faith[37]

---

[35]*Ferrara*, 456 F.3d at 296.

[36]*Scarborough v. State*, 945 A.2d 1103, 1111 (Del. 2008) ("*Scarborough*"); *Chavous v. State*, 953 A.2d 282, 285 (Del. 2008); *Cole v. State*, 922 A.2d 354, 359 (Del. 2005); *State v. Freeman*, 1986 WL 13103, *2 n. 4 (Del. Super. Sept. 4, 1986).

[37]*Scarborough*, 945 A.2d at 1106.

and fair dealing.[38] This covenant of good faith and fair dealing is explained in *Cole* as follows:

> "Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms (citation and footnote omitted)." This concern is particularly relevant in the context of agreements between the State and a criminal defendant, as the State will almost always be in a position to take advantage of its superior ability to control implementation of the agreement's terms. In light of this concern, we emphasize the special role of the prosecutor in a criminal case.[39]

The integrity of the plea bargaining process is of utmost concern to Delaware's courts and "[t]he State must maintain its reputation for fairness in plea bargaining or risk the possible demise of this aspect of the administration of justice."[40]

The State may not withhold critical information.[41] A guilty plea may be considered involuntary if it is induced by threats, misrepresentation, or improper promises.[42] Misrepresentations by the State may justify the withdrawal of a plea to correct a manifest

---

[38] *Cole v. State, supra.*

[39] *Cole v. State, supra* at 359-60.

[40] *State v. Freeman, supra* at *3. *Accord State v. Justice of the Peace Court No. 7,* 1989 WL 31600 (Del. Super. April 3, 1989) at *2.

[41] *Scarborough,* 945 A.2d at 1115.

[42] *Aricidiacono,* 125 A.3d at 679, quoting *Brady v. United States,* 397 U.S. 742, 755 (1970).

16

injustice.[43] Grave prosecutorial misconduct may justify the withdrawal of a guilty plea.[44] In *Monroe v. State*,[45] the Court categorized dishonesty, fraud, deceit, misrepresentation or engaging in conduct that is prejudicial to the administration of justice as professional misconduct.

In this case, the prosecutor's misrepresentation and concealment of the *Brady* material was serious; i.e., it was a grave misrepresentation which constituted grave prosecutorial misconduct. Furthermore, the misrepresentation impacted the integrity of the plea process and the justice system in turn.

The next question is whether defendant suffered prejudice. The answer is that he did. Defendant entered a plea bargain that he otherwise would not have entered. The knowledge he would have had about Mody would have placed him in an entirely different plea bargaining position because the Mody impeachment material weakened the State's case in Def. ID# 1501012420.

In conclusion, when a prosecutor affirmatively misrepresents the State has no *Brady* material on a witness who is material to the State's case and the defendant relies upon that misrepresentation in entering the plea, then the plea is involuntary.[46]

---

[43]*State v. Justice of the Peace Court No. 7, supra* (Court found the State misrepresented that it would not notify the Coast Guard of defendant's plea, and this misrepresentation allowed for the defendant to withdraw his plea).

[44]*Scarborough,* 945 A.2d at 1116; *Chavous v. State,* 953 A.2d at 287.

[45]1998 WL 281186, *8 (Del. Super. May 4, 1998), *aff'd,* 723 A.2d 840, 1998 WL 986032 (Nov. 25, 1998). *Monroe* did **not** involve a guilty plea.

[46]*See Aricidiacono v. State*, 125 A.3d at 679.

17

My findings above establish that an exception to the procedural bars of Rule 61 exists.[47]

---

[47]In Rule 61(i), it is provided:

Bars to relief. --
(1) Time limitation. -- A motion for postconviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court.
(2) Successive motions. --
(i) No second or subsequent motion is permitted under this Rule unless that second or subsequent motion satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule.
(ii) Under paragraph (2) of subdivision (b) of this Rule, any first motion for relief under this rule and that first motion's amendments shall be deemed to have set forth all grounds for relief available to the movant. That a court of any other sovereign has stayed proceedings in that court for purpose of allowing a movant the opportunity to file a second or subsequent motion under this rule shall not provide a basis to avoid summary dismissal under this rule unless that second or subsequent motion satisfies the pleading requirements of subparagraphs (2)(I) or (2)(ii) of subdivision (d) of this rule.
(3) Procedural default. -- Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows
(A) Cause for relief from the procedural default and
(B) Prejudice from violation of the movant's rights.
(4) Former adjudication. -- Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred.
(5) Bars inapplicable. -- The bars to relief in paragraphs (1), (2), (3), and (4) of this subdivision shall not apply either to a claim that the court lacked jurisdiction or to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule.

Subparagraphs (2)(i) or (2)(ii) of subdivision (d) require that a movant:

(i) pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted; or
(ii) pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the

The exception is contained in Rule 61(i)(3)(A) and (B); the Court may consider the motion if it finds cause for relief from not asserting the *Brady* violation in the proceedings leading to the judgment of conviction and prejudice from a violation of defendant's rights.[48] If the Court finds these elements exist, then the defendant does not have to meet the requirements of Rule 61(d)(2)(i) or (2)(ii).[49]

The facts that the State affirmatively denied the existence of *Brady* materials and thus, prevented defendant from learning of their existence until long after the plea was entered constitute cause for relief from the procedural default of defendant not asserting the *Brady* issue in the proceedings leading to the judgment of conviction. As discussed above, defendant was prejudiced by the affirmative misrepresentation and concealment. Thus, defendant is not procedurally barred from seeking to withdraw his plea.[50]

The next issue concerns the remedy to be given. The defendant seeks to withdraw from the plea only as to one case, Def. ID# 1501012420. However, the plea was a global one involving all four cases pending against defendant. This Court previously issued a letter opinion stating that if it should grant a rescission of the plea, then the defendant would have to face trial on every original charge in all four cases.[51] It provided defendant with the opportunity to consider that

---

Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid.

[48] Rule 61(i)(3)(A) and (B).

[49] Defendant does not attempt to meet these requirements.

[50] Rule 61(i)(3).

[51] *State v. Coverdale*, Del. Super., Def. ID#s 1501012420, *et al.*, Stokes, J. (Del. Super. Feb. 6, 2017).

19

result and possibly withdraw his motion for postconviction relief. Defendant was not willing to withdraw his motion. He contended that the Court should vacate the plea in the one case only because he should not bear the burden of the State's misrepresentation by having the entire matter reopened.

As explained below, there is no basis in the law for a remedy such as the one defendant requests. The possible remedies involving a plea agreement are explained in *Scarborough*:

> Because the plea agreement is based on contact principles, a remedy for the violation or breach of the plea agreement should mirror contract remedies while still protecting the defendant's due process rights. ... [W]hen the State breaches a plea agreement generally two alternative remedies exist: (1) the defendant may withdraw his guilty plea, or (2) the sentencing judge may specifically enforce the agreement and correct the defendant's sentence in accord with the plea agreement.
>
> Withdrawal of the guilty plea is equivalent to a rescission of the plea agreement. That remedy restores the parties to their position before they reached the plea agreement. ***
>
> *** [M]oreover, ... allowing the defendant to withdraw his guilty plea should be reserved for instances of grave prosecutorial misconduct.
>
> *** [T]he prosecutor did not engage in misconduct, e.g., a knowingly false promise that induced Scarborough's guilty plea. ... In these circumstances, we conclude that the appropriate remedy is to enforce specifically the State's promise and deny the State's petition to declare Scarborough a habitual offender. (Footnotes and citations omitted.)[52]

Specific performance is not an appropriate remedy here where there was no false promise upon which the defendant relied.[53] In other words, there was no breach of the plea agreement. Instead, the appropriate remedy is a rescission of the agreement because the prosecutor's misbehavior preceding the entry of the plea was grave and the integrity of the plea bargaining

---

[52]*Scarborough v. State, supra* at 1115-16. *Accord Chavous v. State, supra* at 287.

[53]*Scarborough v. State*, 945 A.2d at 1116; *State v. Freeman, supra* (specific enforcement of an agreement granted where the State made a promise which it had not yet fulfilled, and that remedy allowed for the fulfillment of the promise).

process was impacted.[54] Where a rescission of the agreement is granted, the parties are restored "to their position before they reached the plea agreement."[55] No authority exists for vacating a portion of the plea and allowing the rest to stand. The law requires that the entire global plea be vacated and the original charges be reimposed.[56]

In conclusion, I grant defendant's motion for postconviction relief and consequently, vacate the guilty plea. However, the entire plea must be vacated. Trial shall proceed on all of the original counts in all four cases. The parties are instructed to contact Chambers in order to schedule an office conference in this matter so that bond and future scheduling matters may be addressed.

**IT IS SO ORDERED.**

---

[54]*State v. Justice of the Peace Court No. 7, supra.*

[55]*Scarborough v. State*, 945 A.2d at 1116.

[56]*See Miller v. Snyder*, 2001 WL 173796 (D.Del. Feb. 14, 2001) (defendant was tried on the same count to which he previously pled guilty after successfully obtaining a withdrawal of the plea).